UNITED STATES of America, Appellant,

v.

NIPPON PAPER INDUSTRIES CO.,
LTD., et al., Defendants,
Appellees.

No. 96–2001.

United States Court of Appeals,
First Circuit.

Argued Jan. 6, 1997.

Decided March 17, 1997.

Mark S. Popofsky, Attorney, Antitrust Division, U.S. Dep't of Justice, Washington, DC, with whom Anne K. Bingaman, Assistant Attorney General, Joel I. Klein, Deputy

Assistant Attorney General, John J. Powers, III, Robert B. Nicholson, David A. Blotner, Lisa M. Phelan, and Reginald K. Tom, Attorneys, Antitrust Division, were on brief, for the United States.

Richard G. Parker, Washington, DC, with whom Geoffrey D. Oliver, Alan M. Cohen, O'Melveny & Myers LLP, William H. Kettlewell, and Dwyer & Collora were on brief, for Nippon Paper Industries Co., Ltd.

John G. Roberts, Jr., David G. Leitch, H. Christopher Bartolomucci, and Hogan & Hartson L.L.P., Washington, DC, on brief for Government of Japan, amicus curiae.

Before SELYA, Circuit Judge, COFFIN, Senior Circuit Judge, and LYNCH, Circuit Judge.

SELYA, Circuit Judge.

This case raises an important, hitherto unanswered question. In it, the United States attempts to convict a foreign corporation under the Sherman Act, a federal antitrust statute, alleging that price-fixing activities which took place entirely in Japan are prosecutable because they were intended to have, and did in fact have, substantial effects in this country. The district court, declaring that a criminal antitrust prosecution could not be based on wholly extraterritorial conduct, dismissed the indictment. *See United States v. Nippon Paper Indus. Co.*, 944 F.Supp. 55 (D.Mass.1996). We reverse.

## I. JUST THE FAX

■ Since the district court granted the defendant's motion to dismiss for failure to state a prosecutable offense, we draw our account of the pertinent events from the well-pleaded facts in the indictment itself. *See United States v. National Dairy Prods. Corp.*, 372 U.S. 29, 33 n. 2, 83 S.Ct. 594, 598 n. 2, 9 L.Ed.2d 561 (1963).

In 1995, a federal grand jury handed up an indictment naming as a defendant Nippon Paper Industries Co., Ltd. (NPI), a Japanese

manufacturer of facsimile paper.[1] The indictment alleges that in 1990 NPI and certain unnamed coconspirators held a number of meetings in Japan which culminated in an agreement to fix the price of thermal fax paper throughout North America. NPI and other manufacturers who were privy to the scheme purportedly accomplished their objective by selling the paper in Japan to unaffiliated trading houses on condition that the latter charge specified (inflated) prices for the paper when they resold it in North America. The trading houses then shipped and sold the paper to their subsidiaries in the United States who in turn sold it to American consumers at swollen prices. The indictment further relates that, in 1990 alone, NPI sold thermal fax paper worth approximately $6,100,000 for eventual import into the United States; and that in order to ensure the success of the venture, NPI monitored the paper trail and confirmed that the prices charged to end users were those that it had arranged. These activities, the indictment posits, had a substantial adverse effect on commerce in the United States and unreasonably restrained trade in violation of Section One of the Sherman Act, 15 U.S.C. § 1 (1994).

NPI moved to dismiss because, *inter alia*, if the conduct attributed to NPI occurred at all, it took place entirely in Japan, and, thus, the indictment failed to limn an offense under Section One of the Sherman Act. The government opposed this initiative on two grounds. First, it claimed that the law deserved a less grudging reading and that, properly read, Section One of the Sherman Act applied criminally to wholly foreign conduct as long as that conduct produced substantial and intended effects within the United States. Second, it claimed that the indictment, too, deserved a less grudging reading and that, properly read, the bill alleged a vertical conspiracy in restraint of trade that involved overt acts by certain coconspirators within the United States. Accepting a restrictive reading of both the

---

1. The grand jury also named another Japanese manufacturer, Jujo Paper Co., Ltd. (Jujo), as a codefendant. Two years earlier, however, NPI had been formed and, the government alleges, had assumed Jujo's assets and liabilities. Be-
cause the issue of successor liability is not before us, we treat NPI as if it were the sole defendant and as if it, rather than Jujo, were alleged to have committed the acts described in the indictment.

statute and the indictment, the district court dismissed the case. *See United States v. NPI*, 944 F.Supp. at 64–66. This appeal followed.

## II. ANALYSIS

We begin—and end—with the overriding legal question.[2] Because this question is one of statutory construction, we review de novo the holding that Section One of the Sherman Act does not cover wholly extraterritorial conduct in the criminal context. *See United States v. Gifford*, 17 F.3d 462, 471–72 (1st Cir.1994).

Our analysis proceeds in moieties. We first present the historical context in which this important question arises. We move next to the specifics of the case.

### A. *An Historical Perspective.*

Our law has long presumed that "legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248, 111 S.Ct. 1227, 1230, 113 L.Ed.2d 274 (1991) (citation omitted). In this context, the Supreme Court has charged inquiring courts with determining whether Congress has clearly expressed an affirmative desire to apply particular laws to conduct that occurs beyond the borders of the United States. *See id.*

The earliest Supreme Court case which undertook a comparable task in respect to Section One of the Sherman Act determined that the presumption against extraterritoriality had not been overcome. In *American Banana Co. v. United Fruit Co.*, 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909), the Court considered the application of the Sherman Act in a civil action concerning conduct which occurred entirely in Central America and which had no discernible effect on imports to the United States. Starting with what Justice Holmes termed "the general and almost universal rule" holding "that the

character of an act as lawful or unlawful must be determined wholly by the law of the country where the act is done," *id.* at 356, 29 S.Ct. at 512, and the ancillary proposition that, in cases of doubt, a statute should be "confined in its operation and effect to the territorial limits over which the lawmaker has general and legitimate power," *id.* at 357, 29 S.Ct. at 513, the Court held that the defendant's actions abroad were not proscribed by the Sherman Act.

Our jurisprudence is precedent-based, but it is not static. By 1945, a different court saw a very similar problem in a somewhat softer light. In *United States v. Aluminum Co. of Am.*, 148 F.2d 416 (2d Cir.1945) (*Alcoa*), the Second Circuit, sitting as a court of last resort, *see* 15 U.S.C. § 29 (authorizing designation of a court of appeals as a court of last resort for certain antitrust cases), mulled a civil action brought under Section One against a Canadian corporation for acts committed entirely abroad which, the government averred, had produced substantial anticompetitive effects within the United States. The *Alcoa* court read *American Banana* narrowly; that case, Judge Learned Hand wrote, stood only for the principle that "[w]e should not impute to Congress an intent to punish all whom its courts can catch, for conduct which has no consequences within the United States." *Id.* at 443. But a sovereign ordinarily can impose liability for conduct outside its borders that produces consequences within them, and while considerations of comity argue against applying Section One to situations in which no effect within the United States has been shown—the *American Banana* scenario—the statute, properly interpreted, does proscribe extraterritorial acts which were "intended to affect imports [to the United States] and did affect them." *Id.* at 444. On the facts of *Alcoa*, therefore, the presumption against extraterritoriality had been overcome, and the Sherman Act had been violated. *See id.* at 444–45.

---

2. Inasmuch as we hold that activities committed abroad which have a substantial and intended effect within the United States may form the basis for a criminal prosecution under Section One of the Sherman Act, we need not address the

government's alternative argument that the indictment in this case alleges that some overt acts in furtherance of the conspiracy were perpetrated in the United States.

Any perceived tension between *American Banana* and *Alcoa* was eased by the Supreme Court's most recent exploration of the Sherman Act's extraterritorial reach. In *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993), the Justices endorsed *Alcoa*'s core holding, permitting civil antitrust claims under Section One to go forward despite the fact that the actions which allegedly violated Section One occurred entirely on British soil. While noting *American Banana*'s initial disagreement with this proposition, the *Hartford Fire* Court deemed it "well established by now that the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States." *Id.* at 796. The conduct alleged, a London-based conspiracy to alter the American insurance market, met that benchmark.[3] *See id.*

■ To sum up, the case law now conclusively establishes that civil antitrust actions predicated on wholly foreign conduct which has an intended and substantial effect in the United States come within Section One's jurisdictional reach. In arriving at this conclusion, we take no view of the government's asseveration that the Foreign Trade Antitrust Improvements Act of 1982 (FTAIA), 15 U.S.C. § 6a (1994), makes manifest Congress' intent to apply the Sherman Act extraterritorially. The FTAIA is inelegantly phrased and the court in *Hartford Fire* declined to place any weight on it. *See Hartford Fire*, 509 U.S. at 796 n. 23, 113 S.Ct. at 2909 n. 23. We emulate this example and do not rest our ultimate conclusion about Section One's scope upon the FTAIA.

### B. *The Merits.*

Were this a civil case, our journey would be complete. But here the United States essays a criminal prosecution for solely extraterritorial conduct rather than a civil action. This is largely uncharted terrain; we are aware of no authority directly on point, and the parties have cited none.

Be that as it may, one datum sticks out like a sore thumb: in both criminal and civil cases, the claim that Section One applies extraterritorially is based on the same language in the same section of the same statute: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. Words may sometimes be chameleons, possessing different shades of meaning in different contexts, *see, e.g., Hanover Ins. Co. v. United States*, 880 F.2d 1503, 1504 (1st Cir. 1989), *cert. denied*, 493 U.S. 1023, 110 S.Ct. 726, 107 L.Ed.2d 745 (1990), but common sense suggests that courts should interpret the same language in the same section of the same statute uniformly, regardless of whether the impetus for interpretation is criminal or civil.

■ Common sense is usually a good barometer of statutory meaning. Here, however, we need not rely on common sense alone; accepted canons of statutory construction point in the same direction. It is a fundamental interpretive principle that identical words or terms used in different parts of the same act are intended to have the same meaning. *See Commissioner of Internal Revenue v. Lundy*, —— U.S. ——, ——, 116 S.Ct. 647, 655, 133 L.Ed.2d 611 (1996);

---

**3.** As NPI reminds us, four Justices dissented in *Hartford Fire*. This is cold comfort, however, for the dissenters expressed complete agreement with the majority's view on extraterritoriality. *See Hartford Fire*, 509 U.S. at 814, 113 S.Ct. at 2918–19 (Scalia, J., dissenting). By the same token, NPI's attempt to distinguish *Hartford Fire* on the ground that the defendants there conceded the United States' jurisdiction over their conduct fails for two reasons.

In the first place, the assertion is no more than a play on words. The majority opinion in *Hartford Fire* stated that the district court "undoubtedly" had jurisdiction over the civil claims, "as

the London reinsurers apparently concede." *Id.* at 795, 113 S.Ct. at 2909. It is obvious, therefore, that jurisdiction did not depend on the concession; to the contrary, jurisdiction would "undoubtedly" have existed in any event. In the second place, one of the London defendants did not join in this apparent concession, but the Court nonetheless held that defendant's foreign conduct to be within the Sherman Act's proscriptive ambit because it was part of a scheme which "was intended to and did in fact produce a substantial effect on the American insurance market." *Id.* at 795 n. 21, 113 S.Ct. at 2909 n. 21.

*Gustafson v. Alloyd Co.,* 513 U.S. 561, ——, 115 S.Ct. 1061, 1067, 131 L.Ed.2d 1 (1995). This principle—which the Court recently called "the basic canon of statutory construction," *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 479, 112 S.Ct. 2589, 2596, 120 L.Ed.2d 379 (1992)—operates not only when particular phrases appear in different sections of the same act, but also when they appear in different paragraphs or sentences of a single section. *See Russo v. Texaco, Inc.,* 808 F.2d 221, 227 (2d Cir.1986) ("It is a settled principle of statutory construction that [w]hen the same word or phrase is used in the same section of an act more than once, and the meaning is clear as used in one place, it will be construed to have the same meaning in the next place.") (citations and internal quotation marks omitted); *United States v. Gertz,* 249 F.2d 662, 665 (9th Cir.1957) (similar). It follows, therefore, that if the language upon which the indictment rests were the same as the language upon which civil liability rests but appeared in a different section of the Sherman Act, or in a different part of the same section, we would be under great pressure to follow the lead of the *Hartford Fire* Court and construe the two iterations of the language identically. Where, as here, the tie binds more tightly—that is, the text under consideration is not merely a duplicate appearing somewhere else in the statute, but is the original phrase in the original setting—the pressure escalates and the case for reading the language in a manner consonant with a prior Supreme Court interpretation is irresistible. *See United States v. Thompson/Center Arms Co.,* 504 U.S. 505, 518 n. 10, 112 S.Ct. 2102, 2110 n. 10, 119 L.Ed.2d 308 (1992) (plurality op.) (flatly rejecting the idea, while construing language from a statute with both civil and criminal implications, that a court should "refrain in criminal cases from applying statutory language that would have been held to apply if challenged in civil litigation").

The Supreme Court confronted an analogous situation in *Ratzlaf v. United States,* 510 U.S. 135, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994). There, the court dealt with a single criminal penalty clause, contained in 31 U.S.C. § 5322(a) (1994), which authorized punishment for individuals "willfully violat-ing" a number of separate statutory provisions. The defendant was charged under one of these provisions. After noting that identical terms appearing at multiple places within a single statute customarily have a consistent meaning, the Court said: "We have even stronger cause to construe a *single* formulation, here § 5322(a), the same way each time it is called into play." *Id.* at 143, 114 S.Ct. at 660. The *Ratzlaf* Court proceeded to interpret the phrase "willfully violating" to incorporate the same mens rea requirement that had been read into the phrase when section 5322(a) was applied in other contexts. *See id.* at 136–37, 141, 114 S.Ct. at 657, 659. In so doing the Court quoted with approval our statement in *United States v. Aversa,* 984 F.2d 493, 498 (1st Cir.1993) (en banc): "Ascribing various meanings to a single iteration . . .—reading the word differently for each code section to which it applies—would open Pandora's jar. If courts can render meaning so malleable, the usefulness of a single penalty provision for a group of related code sections will be eviscerated."

*Ratzlaf* is not our only teaching aid. This court recently confronted a situation that, putting together its successive stages, throws light upon the problem at hand. Having found an ambiguity in the phrase "cost of producing self-employment income," 7 U.S.C. § 2014(d)(9) (1994), we deferred to a reasonable administrative regulation interpreting it. *See Strickland v. Commissioner, Me. Dep't of Human Servs.,* 48 F.3d 12, 21 (1st Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 145, 133 L.Ed.2d 91 (1995). In a subsequent suit involving the same parties, we debunked the plaintiffs' contention, advanced in a somewhat different context and in connection with a neoteric legal theory, that the phrase in question had a plain meaning. We explained: "Statutory ambiguity does not flash on and off like a bank of strobe lights at a discotheque, shining brightly at the time of one lawsuit and then vanishing mysteriously in the interlude before the next suit appears." *Strickland v. Commissioner, Me. Dep't of Human Servs.,* 96 F.3d 542, 547 (1st Cir.1996). Read in the ensemble, the *Strickland* opinions stand for the proposition that the same phrase, appearing in the same por-

tion of the same statute, cannot bear divergent interpretations in different litigation contexts.

The shared rationale of the *Ratzlaf* and *Strickland* cases reinforces the basic canon of construction and gives us confidence that we should follow the canon here. The words of Section One have not changed since the *Hartford Fire* Court found that they clearly evince Congress' intent to apply the Sherman Act extraterritorially in civil actions, and it would be disingenuous for us to pretend that the words had lost their clarity simply because this is a criminal proceeding. Thus, unless some special circumstance obtains in this case, there is no principled way in which we can uphold the order of dismissal.

NPI and its amicus, the Government of Japan, urge that special reasons exist for measuring Section One's reach differently in a criminal context. We have reviewed their exhortations and found them hollow. We discuss the five most promising theses below. The rest do not require comment.

**1. *Lack of Precedent.*** NPI and its amicus make much of the fact that this appears to be the first criminal case in which the United States endeavors to extend Section One to wholly foreign conduct. We are not impressed. There is a first time for everything, and the absence of earlier criminal actions is probably more a demonstration of the increasingly global nature of our economy than proof that Section One cannot cover wholly foreign conduct in the criminal milieu.

Moreover, this argument overstates the lack of precedent. There is, for example, solid authority for applying a state's criminal statute to conduct occurring entirely outside the state's borders. *See Strassheim v. Daily,* 221 U.S. 280, 285, 31 S.Ct. 558, 560, 55 L.Ed. 735 (1911) (Holmes, J.) ("Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a State in punishing the cause of the harm as if he had been present at the effect, if the State should succeed in getting him within its power."). It is not much of a stretch to apply this same principle internationally, especially in a shrinking world. *See, e.g., Chua Han Mow v. United States,* 730 F.2d 1308, 1311–12 (9th Cir.1984) (applying *Strassheim* principle to conduct in Malaysia involving drugs intended for distribution in the United States), *cert. denied,* 470 U.S. 1031, 105 S.Ct. 1403, 84 L.Ed.2d 790 (1985); *United States v. Hayes,* 653 F.2d 8, 11 (1st Cir.1981) (similar); *cf.* John Donne, *Devotions Upon Emergent Occasions,* no. 17 (1624) (warning that "no man is an island, entire of itself; every man is a piece of the continent, a part of the main").

**2. *Difference in Strength of Presumption.*** The lower court and NPI both cite *United States v. Bowman,* 260 U.S. 94, 43 S.Ct. 39, 67 L.Ed. 149 (1922), for the proposition that the presumption against extraterritoriality operates with greater force in the criminal arena than in civil litigation. This misreads the opinion. To be sure, the *Bowman* Court, dealing with a charged conspiracy to defraud, warned that if the criminal law "is to be extended to include those [crimes] committed outside of the strict territorial jurisdiction, it is natural for Congress to say so in the statute, and failure to do so will negative the purpose of Congress in this regard." *Id.* at 98, 43 S.Ct. at 41. But this pronouncement merely restated the presumption against extraterritoriality previously established in civil cases like *American Banana,* 213 U.S. at 357, 29 S.Ct. at 513. The *Bowman* Court nowhere suggested that a different, more resilient presumption arises in criminal cases.[4]

█ Nor does *United States v. United States Gypsum Co.,* 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978), offer aid and succor to NPI. Recognizing that "the behavior proscribed by the [Sherman] Act is often difficult to distinguish from the gray zone of socially acceptable and economically justifiable business conduct," *id.* at 440–41, 98 S.Ct. at 2875, the *Gypsum* Court held that

4. Indeed, the *Bowman* Court stated that it regarded *American Banana* as an appropriate analogy because the antitrust statute "is criminal as well as civil." 260 U.S. at 98, 43 S.Ct. at 41. This seems to support the notion that the presumption is the same in both instances and leaves little room to argue that the *Bowman* Court was attempting to craft a special, more rigorous rule for criminal proceedings.

criminal intent generally is required to convict under the Act. *See id.* at 443, 98 S.Ct. at 2876–77. Although this distinguishes some civil antitrust cases (in which intent need not be proven) from their criminal counterparts, the *Gypsum* Court made it plain that intent need not be shown to prosecute criminally "conduct regarded as *per se* illegal because of its unquestionably anticompetitive effects." *Id.* at 440, 98 S.Ct. at 2875. This means, of course, that defendants can be convicted of participation in price-fixing conspiracies without any demonstration of a specific criminal intent to violate the antitrust laws. *See, e.g., United States v. Brown,* 936 F.2d 1042, 1046 (9th Cir.1991); *United States v. Society of Indep. Gas. Marketers,* 624 F.2d 461, 465 (4th Cir.1980), *cert. denied,* 449 U.S. 1078, 101 S.Ct. 859, 66 L.Ed.2d 801 (1981); *United States v. Gillen,* 599 F.2d 541, 544–45 (3d Cir.), *cert. denied,* 444 U.S. 866, 100 S.Ct. 137, 62 L.Ed.2d 89 (1979). Because the instant case falls within that rubric, *Gypsum* does not help NPI.

We add that even if *Gypsum* had differentiated between civil and criminal price-fixing cases, NPI's reliance on it would still be problematic. Reduced to bare essence, *Gypsum* focuses on mens rea, noting that centuries of Anglo–American legal tradition instruct that criminal liability ordinarily should be premised on malevolent intent, *see id.* at 436–37, 98 S.Ct. at 2873, whereas civil liability, to which less stigma and milder consequences commonly attach, often requires a lesser showing of intent. There is simply no comparable tradition or rationale for drawing a criminal/civil distinction with regard to extraterritoriality, and neither NPI nor its amicus have alluded to any case which does so.

3. *The Restatement.* NPI and the district court, 944 F.Supp. at 65, both sing the praises of the Restatement (Third) of Foreign Relations Law (1987), claiming that it supports a distinction between civil and criminal cases on the issue of extraterritoriality. The passage to which they pin their hopes states:

[I]n the case of regulatory statutes that may give rise to both civil and criminal liability, such as the United States antitrust and securities laws, the presence of substantial foreign elements will ordinarily weigh against application of criminal law. In such cases, legislative intent to subject conduct outside the state's territory to its criminal law should be found only on the basis of express statement or clear implication.

*Id.* at § 403 cmt. f. We believe that this statement merely reaffirms the classic presumption against extraterritoriality—no more, no less. After all, nothing in the text of the Restatement proper contradicts the government's interpretation of Section One. *See, e.g., id.* at § 402(1)(c) (explaining that, subject only to a general requirement of reasonableness, a state has jurisdiction to proscribe "conduct outside its territory that has or is intended to have substantial effect within its territory");[5] *id.* at § 415(2) ("Any agreement in restraint of United States trade that is made outside of the United States ... [is] subject to the jurisdiction to prescribe of the United States, if a principal purpose of the conduct or agreement is to interfere with the commerce of the United States, and the agreement or conduct has some effect on that commerce."). What is more, other comments indicate that a country's decision to prosecute wholly foreign conduct is discretionary. *See, e.g., id.* at § 403 rep. n. 8.

■ 4. *The Rule of Lenity.* The next arrow which NPI yanks from its quiver is the rule of lenity. The rule itself is venerable; it provides that, in the course of interpreting statutes in criminal cases, a reviewing court should resolve ambiguities affecting a statute's scope in the defendant's favor. *See, e.g., Hughey v. United States,* 495 U.S. 411, 422, 110 S.Ct. 1979, 1985, 109 L.Ed.2d 408 (1990); *Crandon v. United States,* 494 U.S. 152, 158, 110 S.Ct. 997, 1001–02, 108 L.Ed.2d 132 (1990); *United States v. Gibbens,* 25 F.3d 28, 35 (1st Cir.1994); *United States v. Ferryman,* 897 F.2d 584, 591 (1st Cir.), *cert. denied,* 498 U.S. 830, 111 S.Ct. 90, 112 L.Ed.2d 62 (1990). But the rule of lenity is inapposite

5. We note in passing that, by their use of the disjunctive in this section, the drafters of the Restatement seem to suggest a more permissive standard then we, and other American courts, *see, e.g., Alcoa,* 148 F.2d at 444, would deem meet.

unless a statutory ambiguity looms, and a statute is not ambiguous for this purpose simply because some courts or commentators have questioned its proper interpretation.[6] *See Reno v. Koray,* —— U.S. ——, ——, 115 S.Ct. 2021, 2029, 132 L.Ed.2d 46 (1995); *Moskal v. United States,* 498 U.S. 103, 108, 111 S.Ct. 461, 465, 112 L.Ed.2d 449 (1990). Rather, "[t]he rule of lenity applies only if, after seizing everything from which aid can be derived, [a court] can make no more than a guess as to what Congress intended." *Reno,* —— U.S. at ——, 115 S.Ct. at 2029 (citations, internal quotation marks, and certain brackets omitted); *accord United States v. O'Neil,* 11 F.3d 292, 301 n. 10 (1st Cir. 1993) (describing the rule of lenity as "a background principle that properly comes into play when, at the end of a thorough inquiry, the meaning of a criminal statute remains obscure"). Put bluntly, the rule of lenity cannot be used to create ambiguity when the meaning of a law, even if not readily apparent, is, upon inquiry, reasonably clear.

That ends the matter of lenity. In view of the fact that the Supreme Court deems it "well established" that Section One of the Sherman Act applies to wholly foreign conduct, *Hartford Fire,* 509 U.S. at 796, 113 S.Ct. at 2909, we effectively are foreclosed from trying to tease an ambiguity out of Section One relative to its extraterritorial application. Accordingly, the rule of lenity plays no part in the instant case.

■ **5.** *Comity.* International comity is a doctrine that counsels voluntary forbearance when a sovereign which has a legitimate claim to jurisdiction concludes that a second sovereign also has a legitimate claim to jurisdiction under principles of international law. *See* Harold G. Maier, *Extraterritorial Jurisdiction at a Crossroads: An Intersection Between Public and Private International Law,* 76 A.J. Int'l L. 280, 281 n. 1 (1982). Comity is more an aspiration than a fixed rule, more a matter of grace than a matter of obligation. In all events, its growth in the antitrust sphere has been stunted by *Hartford Fire,* in which the Court suggested that comity concerns would operate to defeat the exercise of jurisdiction only in those few cases in which the law of the foreign sovereign required a defendant to act in a manner incompatible with the Sherman Act or in which full compliance with both statutory schemes was impossible. *See Hartford Fire,* 509 U.S. at 798–99, 113 S.Ct. at 2910–11; *see also* Kenneth W. Dam, *Extraterritoriality in an Age of Globalization: The Hartford Fire Case,* 1993 Sup.Ct.Rev. 289, 306–07 (1993). Accordingly, the *Hartford Fire* Court gave short shrift to the defendants' entreaty that the conduct leading to antitrust liability was perfectly legal in the United Kingdom. *See Hartford Fire,* 509 U.S. at 798–99, 113 S.Ct. at 2910–11.

In this case the defendant's comity-based argument is even more attenuated. The conduct with which NPI is charged is illegal under both Japanese and American laws, thereby alleviating any founded concern about NPI being whipsawed between separate sovereigns. And, moreover, to the extent that comity is informed by general principles of reasonableness, *see* Restatement (Third) of Foreign Relations Law § 403, the indictment lodged against NPI is well within the pale. In it, the government charges that the defendant orchestrated a conspiracy with the object of rigging prices in the United States. If the government can prove these charges, we see no tenable reason why principles of comity should shield NPI from prosecution. We live in an age of international commerce, where decisions reached in one corner of the world can reverberate around the globe in less time than it takes to tell the tale. Thus, a ruling in NPI's favor would create perverse incentives for those who would use nefarious means to influence markets in the United States, rewarding them for erecting as many territorial firewalls as possible between cause and effect.

---

**6.** Leaving aside the lower court's decision in this case, no reported opinion has questioned the applicability of *Hartford Fire*'s exercise in statutory construction to the precincts patrolled by the criminal law. Nevertheless, *Hartford Fire*'s rendition of the statute has drawn criticism from the academy. *See, e.g.,* Kenneth W. Dam, *Extraterritoriality in an Age of Globalization: The Hartford Fire Case,* 1993 Sup.Ct.Rev. 289, 307–13 (1993).

We need go no further. *Hartford Fire* definitively establishes that Section One of the Sherman Act applies to wholly foreign conduct which has an intended and substantial effect in the United States. We are bound to accept that holding. Under settled principles of statutory construction, we also are bound to apply it by interpreting Section One the same way in a criminal case. The combined force of these commitments requires that we accept the government's cardinal argument, reverse the order of the district court, reinstate the indictment, and remand for further proceedings.

***Reversed and remanded.***

LYNCH, Circuit Judge (concurring).

The question presented in this case is whether Section One of the Sherman Act authorizes criminal prosecutions of defendants for their actions committed entirely outside the United States. Judicial precedents, culminating with the Supreme Court's decision in *Hartford Fire Insurance Co. v. California*, 509 U.S. 764, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993), conclusively establish that Section One's jurisdictional reach extends, in civil actions, to foreign conduct that is meant to produce, and does in fact produce, substantial effects in the United States. The next question to be asked is whether there is any persuasive reason to believe that, with regard to wholly foreign conduct, Section One in the criminal context is not coextensive with Section One in the civil context.

In answering this second question, courts must be careful to determine whether this construction of Section One's criminal reach conforms with principles of international law. "It has been a maxim of statutory construction since the decision in *Murray v. The Charming Betsy*, 2 Cranch 64, 118, 2 L.Ed. 208 (1804), that 'an act of congress ought never to be construed to violate the law of nations, if any other possible construction remains.'" *Weinberger v. Rossi*, 456 U.S. 25, 32, 102 S.Ct. 1510, 1516, 71 L.Ed.2d 715 (1982). In the *Alcoa* case, Judge Learned Hand found this canon of construction rele-

vant to determining the substantive reach of the Sherman Act, observing that "we are not to read general words [*i.e.*, Section One] ... without regard to the limitations customarily observed by nations upon the exercise of their powers." *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 443 (2d Cir.1945); *see also Hartford Fire*, 509 U.S. at 814–15, 113 S.Ct. at 2918–19 (Scalia, J., dissenting).

The task of construing Section One in this context is not the usual one of determining congressional intent by parsing the language or legislative history of the statute. The broad, general language of the federal antitrust laws and their unilluminating legislative history place a special interpretive responsibility upon the judiciary. The Supreme Court has called the Sherman Act a "charter of freedom" for the courts, with "a generality and adaptability comparable to that found ... in constitutional provisions." *Appalachian Coals, Inc. v. United States*, 288 U.S. 344, 359–60, 53 S.Ct. 471, 474, 77 L.Ed. 825 (1933). As Professors Areeda and Turner have said, the federal courts have been invested "with a jurisdiction to create and develop an 'antitrust law' in the manner of the common law courts." I Areeda & Turner, *Antitrust Law* ¶ 106, at 15 (1978).[7] The courts are aided in this task by canons of statutory construction, such as the presumption against violating international law, which serve as both guides and limits in the absence of more explicit indicia of congressional intent.

Here, we are asked to determine the substantive content of Section One's inexact jurisdictional provision, "commerce ... with foreign nations." 15 U.S.C. § 1. Because of the "compunctions against the creation of crimes by judges rather than by legislators," II Areeda & Hovenkamp, *Antitrust Law* ¶ 311b, at 33 (1995 rev. ed.), the constitution-like aspects of the antitrust laws must be handled particularly carefully in criminal prosecutions.

As the antitrust laws give the federal enforcement agencies a relatively blank check, the development of antitrust law has been

---

**7.** Professors Areeda and Turner also note that "judges sometimes talk as if Congress has al- ready decided the question before them. This is usually a misconception." *Id.*

largely shaped by the cases that the executive branch chooses—or does not choose—to bring. Accordingly it has been said that:

> novel interpretations or great departures have seldom, if ever, occurred in criminal cases, which prosecutors have usually reserved for defendants whose knowing behavior would be generally recognized as appropriate for criminal sanctions.

*Id.* at 34. This case does present a new interpretation. We are told this is the first instance in which the executive branch has chosen to interpret the criminal provisions of the Sherman Act as reaching conduct wholly committed outside of this country's borders.

Changing economic conditions, as well as different political agendas, mean that antitrust policies may change from administration to administration. The present administration has promulgated new Antitrust Enforcement Guidelines for International Operations which "focus primarily on situations in which the Sherman Act will grant jurisdiction and when the United States will exercise that jurisdiction" internationally. Brockbank, *The 1995 International Antitrust Guidelines: The Reach of U.S. Antitrust Law Continues to Expand,* 2 J. Int'l Legal Stud. 1, *22 (1996). The new Guidelines reflect a stronger enforcement stance than earlier versions of the Guidelines, and have been described as a "warning to foreign governments and enterprises that the [antitrust enforcement] Agencies intend to actively pursue restraints on trade occurring abroad that adversely affect American markets or damage American exporting opportunities." *Id.* at *21. The instant case is likely a result of this policy.

It is with this context in mind that we must determine if the exercise of jurisdiction occasioned by the decision of the executive branch of the United States is proper in this case. While courts, including this one, speak of determining congressional intent when interpreting statutes, the meaning of the antitrust laws has emerged through the relationship among all three branches of government. In this criminal case, it is our responsibility to ensure that the executive's interpretation of the Sherman Act does not conflict with other legal principles, including principles of international law.

That question requires examination beyond the language of Section One of the Sherman Act. It is, of course, generally true that, as a principle of statutory interpretation, the same language should be read the same way in all contexts to which the language applies. But this is not invariably true. New content is sometimes ascribed to statutory terms depending upon context. *Cf. Robinson v. Shell Oil Co.,* —— U.S. ——, ——, 117 S.Ct. 843, 847, 136 L.Ed.2d 808 (1997) (depending on context, statutory term may have different meanings in different sections of single statute); 3 Sutherland, *Statutory Construction* § 60.04 (5th ed. 1995) (statutes with both remedial and penal provisions may be construed liberally in remedial context and strictly in penal context). As NPI and the Government of Japan point out, the Supreme Court has held that Section One of the Sherman Act, which defines both criminal and civil violations with one general phrase,[8] "should be construed as including intent as an element" of a criminal violation. *United States v. United States Gypsum Co.,* 438 U.S. 422, 443, 98 S.Ct. 2864, 2876, 57 L.Ed.2d 854 (1978). Where Congress intends that our laws conform with international law, and where international law suggests that criminal enforcement and civil enforcement be viewed differently, it is at least conceivable that different content could be ascribed to the same language depending on whether the context is civil or criminal. It is then worth asking about the effect of the international law which Congress presumably also meant to respect.

The content of international law is determined "by reference 'to the customs and usages of civilized nations, and, as evidence of these, to the works of jurists and commentators.'" *Hilao v. Estate of Marcos,* 103 F.3d 789, 794 (9th Cir.1996) (quoting *The Paquete Habana,* 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900)); *see also Kadic v. Karadzic,* 70 F.3d 232 (2d Cir.1995). The Restatement (Third) of the Foreign Rela-

---

8. "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce ... is declared to be illegal...." 15 U.S.C. § 1.

tions Law of the United States restates international law, as derived from customary international law and from international agreements to which the United States is a party, as it applies to the United States. *See Restatement (Third) of the Foreign Relations Law of the United States* §§ 1, 101 (1987) [hereinafter *Restatement* ]. The United States courts have treated the Restatement as an illuminating outline of central principles of international law. *See Hartford Fire*, 509 U.S. at 799, 113 S.Ct. at 2910–11 (citing Restatement); *Hartford Fire*, 509 U.S. at 818, 113 S.Ct. at 2920 (Scalia, J., dissenting) ("I shall rely on the Restatement (Third) of Foreign Relations Law for the relevant principles of international law. Its standards appear fairly supported in the decisions of this Court construing international choice-of-law principles ... and in the decisions of other federal courts...."); *In re Maxwell Communication Corp.*, 93 F.3d 1036, 1047–48 (2d Cir.1996).

The Restatement articulates principles, derived from international law, for determining when the United States may properly exercise regulatory (or prescriptive) jurisdiction over activities or persons connected with another state. It serves as a useful guide to evaluating the international interests at stake. Sections 402 and 403 articulate general principles. *See Restatement* §§ 402, 403. Section 415 applies these principles to "Jurisdiction to Regulate Anti–Competitive Activities." *Id.* § 415.

Restatement Section 402(1)(c) states that "Subject to § 403," a state has jurisdiction to prescribe law to "conduct outside its territory that has or is intended to have substantial effect within its territory." *Id.* § 402(1).(c). Section 403(1) states that, even when Section 402 has been satisfied, jurisdiction may not be exercised if it is "unreasonable." *Id.* § 403(1). Section 403(2) lists factors to be evaluated in determining if jurisdiction is reasonable:

(a) the link of the activity to the territory of the regulating state, *i.e.*, the extent to which the activity takes place within the territory, or has substantial, direct,

and foreseeable effect upon or in the territory;

(b) the connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible for the activity to be regulated, or between that state and those whom the regulation is designed to protect;

(c) the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted;

(d) the existence of justified expectations that might be protected or hurt by the regulation;

(e) the importance of the regulation to the international political, legal, or economic system;

(f) the extent to which the regulation is consistent with the traditions of the international system;

(g) the extent to which another state may have an interest in regulating the activity; and

(h) the likelihood of conflict with regulation by another state.

*Id.* § 403(2).[9]

Comment f to Section 403 states that the principles of Sections 402 and 403 "apply to criminal as well as to civil regulation." *Id.* § 403 cmt. f. But, specifically naming the United States antitrust laws, the comment also says that for statutes that give rise to both types of liability, "the presence of substantial foreign elements will ordinarily weigh against application of criminal law." *Id.* The comment argues that legislative intent to apply these laws criminally should only be found on the basis of "express statement or clear implication." *Id.*

While the majority opinion accurately states that this comment is an expression of the clear statement rule, the comment also implies that there are special concerns associated with the imposition of criminal sanctions on foreign conduct. *See also id.* § 403

9. Section 403(3) is not applicable here. *See id.* § 403(3) cmt. e.

n. 8 ("In applying the principle of reasonableness, the exercise of criminal (as distinguished from civil) jurisdiction in relation to acts committed in another state may be perceived as particularly intrusive."). Indeed, most people recognize a distinction between civil and criminal liability; that the law of nations should do so as well is not surprising.[10] And while *Hartford Fire* and earlier judicial decisions have found that the antitrust laws do apply, in the civil context, to foreign conduct, this antitrust common law is not the express statement of legislative intent that the Restatement suggests may be appropriate in the criminal context.

Also relevant to the present inquiry is section 415(2), which states that:

> Any agreement in restraint of United States trade that is made outside of the United States, and any conduct or agreement in restraint of such trade that is carried out predominantly outside of the United States, are subject to the jurisdiction to prescribe of the United States, if a principal purpose of the conduct or agreement is to interfere with the commerce of the United States and the agreement or conduct has some effect on that commerce.

*Restatement* § 415(2). Comment a to Section 415 states that the reasonableness principles articulated in Section 403 must still be satisfied. *See id* cmt. a.

Application of these principles to the indictment at issue here leads to the conclusion that the exercise of jurisdiction is reasonable in this case. Here, raising prices in the United States and Canada was not only *a* purpose of the alleged conspiracy, it was *the* purpose, thus satisfying Section 415's "principal purpose" requirement. Moreover, Section 415's requirement of "some effect" on United States markets is amply met here. The indictment alleges that NPI sold $ 6.1 million of fax paper into the United States during 1990, approximately the period cov-

ered by the charged conspiracy. In 1990, total sales of fax paper in North America were approximately $100 million. NPI's price increases thus affected a not insignificant share of the United States market.

These same factors weigh heavily in the Section 403 reasonableness analysis. Because only North American markets were targeted, the United States' interest in combatting this activity appears to be greater than the Japanese interest, which may only be the general interest of a state in having its industries comport with foreign legal norms. Japan has no interest in protecting Japanese consumers in this case as they were unaffected by the alleged conspiracy. The United States, in contrast, has a strong interest in protecting United States consumers, who were affected by the increase in prices. In this situation, it may be that only the United States has sufficient incentive to pursue the alleged wrongdoers, thereby providing the necessary deterrent to similar anticompetitive behavior. In another case, where the consumers of the situs nation were injured as well, that state's interest in regulating anticompetitive conduct might be stronger than it is here.

Other Section 403 factors also counsel in favor of the exercise of jurisdiction here. The effects on United States markets were foreseeable and direct. The Government of Japan acknowledges that antitrust regulation is part of the international legal system, and NPI does not really assert that it has justified expectations that were hurt by the regulation.[11] The only factor counseling against finding that the United States' antitrust laws apply to this conduct is the fact that the situs of the conduct was Japan and that the principals were Japanese corporations. This consideration is inherent in the nature of jurisdiction based on effects of conduct, where the situs of the conduct is, by definition, always a

---

10. Enforcement of criminal laws against foreign nationals for conduct on foreign soil may affect this country's relationship with the foreign country in somewhat different ways than would a civil action. Congress could choose to provide more explicit guidance to the executive and the courts in this area if it is concerned about such impacts on foreign relations.

11. While criminal prosecution may come as a surprise, NPI should have known that civil antitrust liability could include treble damages. A corporation found guilty of a criminal violation of Section One is subject to a fine not exceeding $ 10 million. *See* 15 U.S.C. § 2. Treble damages obviously do not include a similar cap.

foreign country. This alone does not tip the balance against jurisdiction.

For these reasons, I agree with the majority that the district court erred in dismissing the indictment.