**Skinner v. Cunningham et al.**          **CV-00-239-B    08/20/03**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**


<u>**James Skinner**</u>

    **v.**                                    Civil No. 00-239-B
                                         Opinion No. 2003 DNH 142
<u>**Michael Cunningham, et al.**</u>


<u>**MEMORANDUM AND ORDER**</u>

James Skinner brings this 42 U.S.C. § 1983 (1994 & Supp. 2002) civil action against multiple employees of the New Hampshire State Prison ("NHSP") in Concord, New Hampshire. Skinner alleges the defendants violated rights secured to him by the Eighth and Fourteenth Amendments to the United States Constitution. In his four-count complaint, Skinner, a former inmate at NHSP who is currently incarcerated for second-degree murder at MCI-Cedar Junction in South Walpole, Massachusetts, seeks both damages and injunctive relief shielding him from contact with the defendants in the event he is transported to New Hampshire for appearances before this court.

In Count I, Skinner alleges that multiple defendants violated the Eighth Amendment by failing to protect him from a

fellow inmate, Eric Balagot.  Skinner and Balagot were left together in the exercise yard when Balagot attacked him.  A fight ensued in which Skinner ultimately killed Balagot.  In Count II, Skinner claims prison officials violated his right to due process by indefinitely continuing a disciplinary hearing related to his encounter with Balagot.  Skinner alleges a second violation of the Eighth Amendment in Count III.  Specifically, Skinner alleges various defendants "assault[ed], terroriz[ed], and harass[ed]" him in violation of his right to be free from cruel and unusual punishment.  Complaint at ¶ 93.

Defendants move for summary judgment on Counts I-III.  (Doc. No. 42).  Defendants argue that Skinner has failed to allege any fact demonstrating the alleged constitutional violations.  For the reasons discussed below, I grant defendants' motion as to Counts II and III in their entirety, but deny defendants' motion as a portion of Count I.


## I.  BACKGROUND

### A.  James Skinner and Eric Balagot

James Skinner is a Massachusetts inmate serving a life

sentence for second-degree murder.  In May 1998, after a series

of violent incidents with other inmates, some of which were

racially-motivated,[1] Skinner was transferred from a Massachusetts

prison to NHSP.  When a new inmate arrives at NHSP, officials

assess where he should be housed and what programs he may

participate in.  Once at NHSP, officials classified Skinner at

the highest possible level of security given his criminal record

and institutional history.  Skinner, like all inmates classified

at the highest level, was assigned to the Special Housing Unit

("SHU").

Eric Balagot arrived at NHSP in February 1998 and spent time

in various housing units at the prison.  Balagot was a known

white supremacist who had a tattoo of a swastika on his chest.

In June 1998, a NHSP officer, suspecting gang activity, seized a

note from Balagot when he attempted to hand it to another inmate.

The note was a handwritten copy of the "Aryan Creed."

Balagot was involved in two altercations prior to being

transferred to Skinner's tier in SHU.  On February 10, 1998, only

four days after arriving at NHSP, Balagot and Hector Diaz, an

---

[1]    Skinner is African-American.

Hispanic inmate, got into a fight. After the fight, Balagot told NHSP staff that he subscribed to the White Pride philosophy. On another occasion, less than two weeks later, Balagot was involved in another fight with Troy Muder, a white inmate.

Defendants Jay Nagey, Walter Davies, Keith Hardy, and Daniel Shaw met to discuss where to house Balagot within SHU. When the decision was made to move Balagot back to SHU, only tiers B and D were the viable options. The officers decided to house Balagot in D-Tier because Muder, a inmate Balagot had already had an altercation with, resided in B-Tier. On July 23, 1998, NHSP officials moved Balagot from the Closed Custody Unit ("CCU") back to SHU. The next day officials moved Balagot to D-Tier within SHU, where Skinner lived. D-Tier was also home to two other known white supremacists: Gerald Boulanger and Lenny Kenney.

That same day, William Wilson, an investigations officer at NHSP, entered the SHU Unit Manager's Office and heard someone mention Balagot. At that point Wilson, trained in gang management, interrupted the conversation to inform the officers that, in his opinion, Balagot should not be housed with other white supremacists. Wilson summarized his input in the conversation as follows:

-4-

> On 23 July 1998 at approximately 10:30 I was in the Unit Manager's Office of the Special Housing Unit. Also present were Sergeant Keith Hardy, Lieutenant Daniel Shaw, Counselor Jay Nagy [sic], and Unit Manager Walter Davies.[2] Someone mentioned that Inmate Eric Belagot [sic] was now housed in the unit. I advised Shaw and Davies that Belagot was a hard core [w]hite [s]upremacist and he should [be] housed away from other [w]hite [s]upremacists such as [i]nmates Gerard Boulanger, Kenneth Sampson and Leonard Kenney.[3] I advised them that Belagot was not a leader but rather a follower and could easily be talked into assaulting other inmates for the [w]hite [s]upremacists. I also advised them that Belagot had been involved in assaults with inmates of color while incarcerated at the NHSP.

Ex. 14 to Pl.'s Obj. to Defs.' Mot. for Summ. J. Despite Wilson's comment, Balagot remained housed on the D-Tier with Skinner and the other white supremacists.

## B.  <u>The Exercise Yard Incident</u>

Generally, inmates housed within SHU are permitted to have time in the SHU exercise yard together and are escorted to the exercise yard by two NHSP officers. Once they are in the yard, they are supervised by a camera system in which an officer watches the inmates via closed circuit television monitors. The

---

[2]  Defendants Nagey, Shaw, Hardy and Davies make up the SHU unit team who discussed Balagot's placement within SHU.

[3]  To clarify, only Kenney and Boulanger were actually housed on D-Tier with Balagot and Skinner. Kenneth Sampson was housed elsewhere.

two cameras in the exercise yard "are fixed, do not rotate, have no zoom capability.  It takes 27 seconds for all eight camera shots to be cycled through the system monitor. . . The quality of the picture is poor and there are blind spots, glaring and shadows to contend with."  Ex. 18 of Pl.'s Obj. to Defs.' Mot for Summ. J. at 4.  Although officers walking around the inside of the unit are expected to observe the exercise yard, "no staff regularly monitors the yards either physically or visually."  Id.

The first night Balagot was housed in D-Tier, Skinner heard a lengthy conversation between Balagot and Boulanger.  The two were discussing "white Aryan resistance," for hours and prompted Skinner to interrupt the conversation.  Ex. 1 to Pl.'s Obj. to Defs.' Mot. for Summ. J. at 8, 11.  The following morning, Defendants Santo Fiorillo and Eric Denis escorted Skinner, Balagot and other inmates, including white supremacists Boulanger and Kenney, out to the exercise yard.  The officers left to conduct other inmate moves.  Officer Lambrou monitored the SHU exercise yard via closed circuit television.  At some point soon after their exercise time began, Balagot punched Skinner, instigating a fight that ultimately resulted in Balagot's death and injuries to Skinner.  Officer Lambrou did not see anything

out of the ordinary on the closed circuit televisions and did not call for help. Corrections officers arrived only after the fight was complete. Ex. 1 to Pl.'s Obj. to Defs.' Mot. for Summ. J. at 38.

## C.  **After Balagot's Death**

After Balagot's death Skinner was transferred from SHU's D-Tier to its N-Tier. N-Tier is a restricted tier used only in special circumstances. Skinner remained on N-Tier for 40 days, when he was transferred to I-Tier, again within SHU. NHSP's investigative unit determined that Skinner had violated the prison's disciplinary rules and filed a disciplinary report charging Skinner with violating rule 1-A (causing death of another inmate). At the time of Skinner's disciplinary report, Ray Guimond, a hearings officer for the department of corrections ("DOC"), received Skinner's disciplinary report and scheduled a hearing for August 19, 1998. Ex. V. to Defs.' Mot. for Summ. J.

Subsequent to setting the hearing date, prosecutors at the Attorney General's office requested Guimond "suspend any pending disciplinary charges against Skinner until the criminal charges were adjudicated." Aff. of Guimond, Ex. M. to Defs.' Mot. for Summ. J. Guimond cooperated with the Attorney General's request

and continued the hearing pending the outcome of the criminal case.

A jury indicted Skinner for murder and in May 1999, he was tried before a jury in Merrimack County Superior Court. Skinner claimed self defense and took the stand. The jury deadlocked and the judge declared a mistrial. In January 2000, Skinner was tried a second time. Skinner testified again that Balagot started the fight by attacking him. This time, the jury unanimously acquitted Skinner of the murder charge and all lesser charges. As a result of the not guilty verdict, Guimond never held a hearing on Skinner's alleged disciplinary charges.

### D.    Skinner's Excessive Force Claims

After Balagot's death, Skinner began receiving disciplinary write-ups for violating NHSP rules. The ten write-ups Skinner received between March 29, 1999 and October 5, 1999 "primarily concern[ed] aggressive or insubordinate behavior towards the officers – e.g. refusing to be handcuffed, refusing to come out of his cell, covering his cell window, refusing to stand for count, refusing to obey orders, spitting at corrections officers." Aff. of Greg Crompton, Ex. A to Defs.' Mot. for Summ. J.

Skinner complains of excessive force resulting, largely, from three cell extractions. The first occurred on June 22, 1999, when Skinner placed a sheet over his cell window. This is prohibited by NHSP rules because officers cannot see into an inmate's cell and therefore have no way to monitor his behavior and health. Officers approached Skinner's cell and asked him to remove the sheet. Skinner refused. At this point, officers put together a "move team," composed of defendant Scott Dodge and four other officers, to approach Skinner's cell, remove him, remove the sheet, and search his cell. The move team arrived at Skinner's cell and announced their presence. <u>See</u> Video Tape, Ex. Y to Defs.' to Mot. for Summ. J. After entering Skinner's cell, Skinner began fighting and wrestling with the officers. The officers were forced to restrain and handcuff him.

The second extraction took place just weeks later on July 6, 1999. SHU officers approached Skinner's cell to search it. SHU procedures require that inmates be handcuffed or "cuff up" before being removed from their cells. In SHU, cuffing up is accomplished by an inmate sliding his wrists through the food tray slot in the door of the cell. When SHU officers told Skinner to "cuff up," he refused. Defendant Kenney then repeated

the request that Skinner "cuff up" so that officers could search his cell. Skinner once again refused and officers assembled a move team to remove Skinner from his cell. When the officers opened the cell door, Skinner lurched out of the cell towards the officers standing in the tier. Members of the move team them tried to subdue Skinner, but once again he wrestled with the move team. At this point, defendant Kenney sprayed OC spray[4] on Skinner, inadvertently spraying other members of the move team as well. Skinner finally stopped resisting the officers, who then transported Skinner to the showers to wash off the OC spray. See Ex. Y. to Defs.' Mot. for Summ. J. Skinner also requested medical attention, which he promptly received in the SHU's day room. See id.

The third, and last, cell extraction took place on March 24, 2000 after Skinner threw food at SHU staff. As a result of Skinner's behavior, SHU staff decided to move Skinner to a more secure cell that had different doors. SHU officers, once again,

---

[4] "[A] chemical irritant derived from Cayenne pepper, which causes irritation and discomfort to the skin as well as burning and tearing of the eyes. It is intended as a non-lethal mode of applying force and causing opponents to cease resisting." Defs.' Mot. for Summ. J. at 15.

asked Skinner to cuff up for the move and he refused. Another move team, consisting of defendants Neil Smith, Sean McLeod, Dodge, and other officers, approached Skinner's cell. Officer Smith sprayed OC spray into Skinner's cell with the intention of forcing Skinner out of his cell peacefully. Smith's efforts failed and Skinner continued to refuse Smith's instructions. The move team then entered Skinner's cell and struggled to restrain a belligerent Skinner. At some point, Officer Dodge poked Skinner in the eye and caused Skinner's eye to swell. The move team successfully restrained Skinner and carried him face down to a cell on N-Tier. Members of the move team reminded one another to support Skinner's neck and head as they carried him. See Ex. Y to Defs.' Mot. for Summ. J. Skinner, once again, received immediate medical attention. Id.

Two days later, a physician at Concord Hospital examined Skinner. The physician noted Skinner's eyes were red and swollen, but did not note any structural damage to his eyes. In addition, the physician noted that there was "no evidence of injury to [Skinner's] head or . . . scalp." Ex. T to Defs.' Mot. for Summ. J.

During the time period in which the cell extractions were taking place, Skinner alleges he endured harassment from various defendants. For example, he alleges defendant Locke "sarcastically waived a confederate flag bandana" toward him. Compl. ¶ 63. In addition, he claims defendant Dodge referred to him as "that nigger upstairs." Compl. ¶ 64. Skinner also alleges that various defendants slammed metal doors in his tier "at all hours of the night." Compl. ¶ 68.

## II.  ANALYSIS

### A.   Count I: "Failure to Protect" Claim

Skinner's failure to protect claim can be broken into three sub-parts: (1) his claim against officers Davies, Shaw, Hardy, and Nagey for making the decision to house Balagot in D-Tier; (2) his claim against officers Fiorillo and Denis for failing to observe the exercise yard when they were aware of the deficiencies in NHSP's camera system; and (3) a supervisory liability claim against Warden Cunningham for "failing to have the faulty" camera system repaired. Compl. ¶ 86.

The Eighth Amendment imposes "a duty . . . to protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833 (1994) (citing Cortes-Quinones v. Jimenez-Nettleship, 842 F.2d 556, 558 (1st Cir. 1988), *cert. denied*, 488 U.S. 823 (1988). That duty, however, requires only that prison officials not be "deliberately indifferent to the risk to prisoners of violence at the hands of other prisoners." Burrell v. Hampshire County, 307 F.3d 1, 8 (1st Cir. 2002)(citing Farmer, 511 U.S. at 833). In the context of an Eighth Amendment claim, deliberate indifference has two components. See id. "First, the deprivation alleged must be, objectively, sufficiently serious." Id. (citing Farmer, 511 U.S. at 834). In a failure to protect claim such as this one, a plaintiff "must demonstrate that he was incarcerated under conditions imposing a substantial risk of serious harm." Id. Second, a plaintiff must also show that the defendants had "a sufficiently culpable state of mind," in this case one of "deliberate indifference" to Skinner's health or safety. Farmer, 511 U.S. at 834.

The Farmer Court defined "deliberate," in the context of an Eighth Amendment claim to require that a prison official "must be both aware of facts from which the inference could be drawn that

-13-

a substantial risk of serious harm exists, and he must also draw that inference." Id. The First Circuit, among others, has likened this requirement to "the standard for determining criminal recklessness." Giroux v. Somerset County, 178 F.3d 28, 32 (1st Cir. 1999) (internal citations omitted). As the First Circuit summarized in Calderón-Ortiz v. Laboy-Alvarado, 300 F.3d 60, 64 (1st Cir. 2002), the second requirement of Farmer requires Skinner to show: (1) the defendant knew of (2) a substantial risk (3) of serious harm and (4) disregarded that risk. Id. (citing Farmer, 511 U.S. at 835-840).

1. Skinner's Claims for Moving Balagot to D-Tier

Skinner argues that defendants Davies, Shaw, Hardy and Nagey failed to protect him when, after being warned by Investigator Wilson, they placed Balagot on D-Tier with other known white supremacists. Defendants argue that Skinner cannot successfully demonstrate that they acted with deliberate indifference. Specifically, they argue that there is "no evidence that the defendants knew anything about Skinner's past which would have told them that Balagot posed a particular threat to him." Defs.' Mot. for Summ. J. at 17. I disagree. Skinner puts forth evidence that the officers knew of Balagot's white supremacist

-14-

views, his prior assaults and the fact that he was easily manipulated by other white supremacists.  This evidence is sufficient to create a triable issue as to whether the defendants acted with deliberate indifference.

2.  Leaving Inmates in Exercise Yard Together

Skinner argues that defendants Fiorillo and Denis are liable because they placed Skinner, Balagot and other inmates in the exercise yard when the knew the video cameras could not effectively monitor the inmates.  Defendants respond by claiming that Fiorillo and Denis had no knowledge that Balagot presented a threat to Skinner's safety.  Although Skinner presents evidence that Fiorillo and Denis knew the camera monitoring system was faulty, the summary judgment record is devoid of any evidence of deliberate indifference.  See Farmer, 511 U.S. at 835-840.  In particular, Skinner fails to identify any evidence demonstrating that defendants Fiorillo and Denis were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [that they]. . . dr[ew] that inference." Id. at 834.  As such, I grant defendants' motion as to defendants Fiorillo and Denis.

3.  <u>Supervisory Liability for Failing to Protect</u>

Skinner also alleges that Michael Cunningham, the Warden at NHSP, is liable as a supervisor for NHSP's policy of placing inmates in the exercise yard without direct supervision from floor officers.  Skinner cannot base this claim on a respondeat superior theory of liability.  Instead, Cunningham can only be liable as a supervisor under § 1983 based on his own acts or omissions.  <u>Aponte Matos v. Toledo Dávilo</u>, 135 F.3d 182, 192 (1st Cir. 1998) (citing <u>Seekamp v. Michaud</u>, 109 F.3d 802, 808 (1st Cir. 1997).  Specifically, Cunningham is liable as a supervisor only if "there is subordinate liability, and . . . the supervisor's action or inaction was affirmatively linked to the constitutional violation caused by the subordinate."  <u>Id.</u> (internal quotation marks omitted).  As Skinner's claim against Cunningham rests on NHSP's exercise yard supervision and I dismissed his only claim against subordinates Fiorillo and Denis related to the exercise yard, there can be no supervisory liability against Cunningham on this basis.  As such, I grant defendants' motion to dismiss against Cunningham as it relates to Skinner's "failure to protect" claim.

-16-

**B.   Skinner's Due Process Claim**

In Count II, Skinner alleges defendant Ray Guimond violated his right to due process by "indefinitely continu[ing] the hearing on the disciplinary charge arising out of Balagot's death."  Compl. ¶ 90.  Skinner further states that as a result he was confined to N-Tier, a more secure SHU tier, for 40 days and confined to SHU for the remainder of his stay at NHSP.  Compl. ¶ 91.  In <u>Sandin v. Conner</u>, 515 U.S. 472, 483 (1995), the Supreme Court acknowledged that a state may, under certain circumstances, create liberty interests implicating the Due Process Clause.  It held, however, that:

> [T]hese interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . nonetheless imposes *atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.*

<u>Dominique v. Weld</u>, 73 F.3d 1156, 1159, (1st Cir. 1996)(emphasis in original) (citing <u>Sandin</u>, 515 U.S. at 483).  Skinner argues that N-Tier's conditions were "atypical and significant" in that he was deprived of typical features of NHSP namely access to television, radios, canteen, education and vocational opportunities and regular outdoor exercise.  Pl.'s Obj. to Defs.'

-17-

Mot. for Summ. J. at 17. This argument fails in light of <u>Sandin</u>, however, because, as the court in that case recognized, 30 days of punitive segregation does not qualify as the kind of atypical and significant hardship that is required to implicate a liberty interest under the Due Process Clause.

## C. <u>Skinner's Cruel and Unusual Punishment Claims</u>

Skinner's third, and final, claim involves a series of events that amount, in his opinion, to a violation of the Eighth Amendment's prohibition against cruel and unusual punishment. Skinner divides his claims into two groups: (1) claims arising from the three cell extractions; and (2) remaining instances of harassment.

### 1. <u>Cell Extractions</u>

Skinner's challenge to the three cell extractions is not directed at the removals themselves. Instead, Skinner argues that the extractions "were overkill, that the reasons giving rise to the extractions did not warrant such a heavy handed response. Put differently, [he contends that] defendants could have resolved the perceived problem by non-violent responses." Pl.'s Obj. to Defs.' Mot. for Summ. J. at 19.

When confronted with a disturbance, such as when Skinner resisted restraint or charged the tier when defendants opened his cell door, prison officials "must balance the threat unrest poses to inmates, prison workers . . . against the harm [the] inmate[] may suffer if guards use force." Hudson v. McMillian, 503 U.S. 1, 6 (1992). Accordingly, Skinner must demonstrate that force was applied "maliciously and sadistically for the very purpose of causing harm," rather than "in a good faith effort to maintain or restore discipline." Id. (citing Whitley v. Albers, 475 U.S. 312, 320-321 (1986)) (internal quotation marks omitted). In making this determination, Whitley and Hudson instruct me to evaluate "the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials . . . and any efforts made to temper the severity of a forceful response." Id. at 7 (quoting Whitley, 475 U.S. at 321)(internal quotation marks omitted).

In each of the three extractions, Skinner was asked repeatedly to comply with corrections officers instructions, for example to "cuff up." After refusing to cooperate, Skinner wrestled and fought the officers again refusing their

-19-

instructions that he cease fighting and allow them to restrain him.  In addition, Skinner is an extremely strong inmate who, in one incident, pushed through several officers and made his way onto the prison tier.  See Ex. Y to Defs.' Mot for Summ. J.  During the third extraction, Skinner claims his throat was improperly held and his eyes were poked.  Even assuming that this occurred, there is no evidence to demonstrate that during the chaos he created, defendants maliciously injured him.  In addition, as the video exhibit demonstrates, the officers were very aware of how they were holding Skinner's head and repeatedly instructed one another to support his neck.  See id.  There is simply no evidence that any defendant acted "maliciously or sadistically for the very purpose of causing harm."  See Hudson, 503 U.S. at 6.

    2.  Other Alleged Forms of Harassment

Skinner states that the defendants' alleged harassment amounts to cruel and unusual punishment.  Specifically, Skinner alleges that racial comments, accusations of biting defendant Dodge, and slamming cell doors during the night deny him of civilized measure of life's necessities.  See Hudson, 503 U.S. at 9; see also, Rhodes v. Chapman, 452 U.S. 337, 347 (1981).

"Extreme deprivations are required to make out a conditions of confinement claim" under the Eighth Amendment. <u>Hudson</u>, 503 U.S. at 9. Defendants argue that even if Skinner's allegations are true, they do not amount to a "sufficiently serious" deprivation to amount to an Eighth Amendment violation. <u>Wilson v. Seiter</u>, 501 U.S. 294, 299 (1991). I agree. Even if Skinner's accusations are true, they do not deprive him of life's necessities. For example, the racial comment Skinner complained of appears to be an isolated incident overheard by Skinner while a defendant was on another tier. Even if I view these incidents cumulatively, factually they do not amount to the kind of deprivation required to give rise to an Eighth Amendment violation. As such, I grant defendants' motion to dismiss Count III in its entirety.

## III. <u>CONCLUSION</u>

For the forgoing reasons, I grant defendants' motion for summary judgment in part and deny it in part. (Doc. No. 42). I grant defendants' motion as follows: Count I as to defendants Cunningham, Fiorillo and Denis; Count II in its entirety; and

-21-

Count III in its entirety.  I deny defendants' motion as to Count I against defendants Nagey, Shaw, Davies, and Hardy.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

August 20, 2003

cc:  Andrew B. Livernois, Esq.
     Michael Sheehan, Esq.