*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0454P (6th Cir.)
File Name: 03a0454p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

_____

GRUNDY MINING COMPANY,
    *Petitioner,*

  *v.*

DOUGLAS W. FLYNN and
DIRECTOR, OFFICE OF
WORKERS' COMPENSATION
PROGRAMS, UNITED STATES
DEPARTMENT OF LABOR,
    *Respondents.*

No. 01-3111

On Petition for Review of an Order of the
Benefits Review Board,
United States Department of Labor.
No. 99-0386 BLA.

Argued: August 6, 2002

Decided and Filed: December 23, 2003

Before: MOORE and GILMAN, Circuit Judges; ROSEN,
District Judge.*

_____

 *The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

_____

#### COUNSEL

**ARGUED:** Ronald E. Gilbertson, BELL, BOYD & LLOYD, Washington, D.C., for Petitioner. Mary Forrest-Doyle, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondents. **ON BRIEF:** Ronald E. Gilbertson, BELL, BOYD & LLOYD, Washington, D.C., for Petitioner. Christian P. Barber, Edward Waldman, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondents.

ROSEN, D. J., delivered the opinion of the court, in which GILMAN, J., joined. MOORE, J. (pp. 30-38), delivered a separate opinion concurring in the result only.

_____

#### OPINION

_____

ROSEN, District Judge.

### I. *INTRODUCTION*

This action for coal miner's black lung benefits arises under Title IV of the Federal Coal Mine Health and Safety Act of 1969, as amended, 30 U.S.C. §§ 901-945 ("Black Lung Benefits Act" or "BLBA"). The petitioner/employer, Grundy Mining Company, appeals from a final order of the United States Department of Labor ("DOL") Benefits Review Board ("Board" or "BRB") granting benefits to respondent/claimant Douglas W. Flynn. The respondent Director of the Office of Workers' Compensation Programs of the DOL ("Director") has also been named as a party in interest.

This case has a long and involved history. Mr. Flynn filed his first claim for black lung benefits in 1970, while he was still working in the coal mines. The claim was finally denied

in 1981 because Flynn failed to prove that he was totally disabled due to the pulmonary ailment pneumoconiosis. Had Flynn been entitled to benefits at that time, responsibility for payment would have been assumed by the Black Lung Disability Trust Fund ("Trust Fund").

Mr. Flynn filed another claim for benefits in 1984, a month after retiring from the coal company. Pursuant to 20 C.F.R. § 725.309 (1999), this claim was considered a "duplicate." In order to escape the *res judicata* effect of his earlier claim, Flynn had to demonstrate a "material change in conditions" since the prior claim's denial. Having surmounted this threshold obstacle, he then had to prevail on the merits. The present "duplicate" claim has been back and forth between the Administrative Law Judge ("ALJ") and the Board four times. On appeal to this Court, three questions remain: (1) Did Mr. Flynn establish a "material change" under the governing legal standard? (2) Who, as between Grundy Mining and the Trust Fund, should bear responsibility for paying any award of benefits? and, (3) Does substantial evidence support the ALJ's finding that Flynn's total disability was due to pneumoconiosis?

In the administrative proceedings, the Board held that Mr. Flynn had properly established a "material change" and total disability due to pneumoconiosis. The Board acknowledged some idiosyncrasies in the examining doctor's report, yet deferred to the ALJ's judgment in weighing the evidence. The Board further held that Grundy Mining must assume responsibility for the payment of benefits since Flynn's 1984 claim did not meet the statutory requirements for transfer to the Trust Fund. For the reasons set forth below, we affirm the Board's decision on each of these points.

## II.  *FACTUAL AND PROCEDURAL BACKGROUND*

### A.  The Claimant's Coal Mine Employment and Medical History

Claimant Douglas W. Flynn was born in May 1913, completed eighth grade, and by 1932 was working in the Tennessee coal mines. His career in the mines spanned more than 50 years, ending in 1984. For approximately 20 years early in his career, he worked in the mines as a maintenance man. During the latter part of his career, Flynn worked as a light and utility man, with his responsibilities including delivery of supplies to various areas of the mine and tending to the electric lamps used by the miners. Although his work station at that time was at the entrance to the mine, he remained exposed to coal dust.

Mr. Flynn first applied for black lung benefits in November 1970, claiming that he was disabled by virtue of breathing difficulties. He was engaged in coal mine employment at the time, and remained so employed in 1981 when his first claim ultimately was denied. Flynn filed a duplicate claim in March 1984, a month after retiring (at age seventy) from the coal company. It is this 1984 claim that is at issue here.

Two medical opinions of record, both by Dr. Martin Fritzhand, are relevant to the issues before us. First, upon examining Mr. Flynn on behalf of the DOL on July 26, 1980, in connection with the miner's first claim, Dr. Fritzhand reported a pulmonary function study which was non-qualifying,[1] as set forth in Table 1 below.

---

[1]A pulmonary function study which "qualifies" to demonstrate total disability under 20 C.F.R. § 718.204(b)(2)(i) is one in which the $FEV_1$ and either the MVV or FVC meet or fall below the table values at Appendix B of 20 C.F.R. Part 718 for the miner's height, age, and gender, or in which the ratio of the $FEV_1$ to FVC is 55 percent or less.

*Table 1: 1980 Pulmonary Function Study*

|  | Forced Expiratory Volume in One Second ("FEV$_1$") | Forced Vital Capacity ("FVC") | Maximum Voluntary Ventilation ("MVV") | FEV$_1$/FVC |
|---|---|---|---|---|
| Qualifying Standard | ≤ 2.51 | ≤ 3.2 | ≤ 100 | ≤ 0.55 |
| Flynn's Actual Result | 3.3 | 4.3 | 117 | 0.77 |

Dr. Fritzhand further reported an arterial blood gas study on that occasion which was non-qualifying as well,[2] as shown in Table 2 below.

*Table 2: 1980 Blood Gas Study*

|  | pCO$_2$ | pO$_2$ |
|---|---|---|
| Qualifying Standard (at pCO$_2$ = 37.5) |  | ≤ 62 |
| Flynn's Actual Result | 37.5 | 80.0 |

[2] A blood gas study which "qualifies" to demonstrate total disability under 20 C.F.R. § 718.204(b)(2)(i) must have values at or below the table values at Appendix C of 20 C.F.R. Part 718 for the altitude at which the test was administered.

Dr. Fritzhand reported at that time that Flynn could "ambulate on level terrain no more than 200 feet without associated shortness of breath," and that this "this symptom increase[d] upon climbing stairs or walking up grades." (J.A. at 135.) The doctor further stated that Flynn was "unable to mow a lawn without associated dyspnea." *Id.* When asked to "describe and explain limitations . . . that may be due to pulmonary disease," Dr. Fritzhand opined that Flynn could do "mild activity at best without ass[ociated] s[hortness] o[f] b[reath]." (J.A. at 133.) Dr. Fritzhand diagnosed chronic obstructive pulmonary disease related to coal mine employment, as well as hypertension.

Four years later, and several months after he ceased coal mine work, Mr. Flynn again was examined by Dr. Fritzhand on behalf of the DOL, this time in connection with the present claim. In a report dated June 16, 1984, Dr. Fritzhand noted another non-qualifying pulmonary function study, as well as another non-qualifying blood gas study. See Tables 3 and 4 below.

*Table 3: 1984 Pulmonary Function Study*

|  | FEV$_1$ | FVC | MVV | FEV$_1$/FVC |
|---|---|---|---|---|
| Qualifying Standard | ≤ 2.35 | ≤ 3.02 | ≤ 94 | ≤ 0.55 |
| Flynn's Actual Result | 3.3 | 4.2 | 67.2 | 0.79 |

*Table 4: 1984 Blood Gas Study*

|  | $pCO_2$ | $pO_2$ |
|---|---|---|
| Qualifying Standard (at $pCO_2$ = 33.9) |  | ≤ 66 |
| Flynn's Actual Result | 33.9 | 72.1 |

Following this examination, Dr. Fritzhand reported that Flynn could "ambulate on level terrain no more than 300 feet without associated shortness of breath," and that "this symptom increase[d] upon climbing stairs or walking up grades." (J.A. at169.) He also stated that Flynn was "unable to mow a lawn without associated dyspnea." *Id.* When asked to "describe and explain limitations . . . that may be due to pulmonary disease," Dr. Fritzhand responded that Flynn was able to do "no more than sedentary activity." (J.A. at 167.) Dr. Fritzhand diagnosed ASHD (arteriosclerotic heart disease) with atrial fibrillation, hypertension, and congestive heart failure, as well as pneumoconiosis related to coal mine employment.

## B.    Procedural History

### 1.    Flynn's First Claim for Black Lung Benefits

Mr. Flynn's initial claim for federal black lung benefits was filed on November 21, 1970, and was originally denied by the Social Security Administration ("SSA") on April 9, 1971. Flynn then filed an election card to request review of this claim under the Black Lung Benefits Reform Act of 1977. As a result of this filing, any liability would have transferred to the DOL's Trust Fund, had Flynn been entitled to benefits. *See* 30 U.S.C. § 932(c),(j)(3); 20 C.F.R. § 725.496(d). *See*

*generally Director, OWCP v. Quarto Mining Co.*, 901 F.2d 532, 535 (6th Cir. 1990) (reviewing this statutory scheme).

Following this second round of review, Mr. Flynn's initial claim for black lung benefits was finally denied by the DOL's district director on June 15, 1981. The district director determined that Flynn had pneumoconiosis arising out of his coal mine employment, but denied the claim on the ground that Flynn failed to establish his total disability as a result of this disease.

### 2.    Flynn's Second Claim for Black Lung Benefits

Mr. Flynn subsequently filed the present claim on March 13, 1984. The district director denied the new claim but, at Flynn's request, referred it for a formal hearing. A lengthy administrative review process ensued, spanning well over a decade, and culminating in the Benefits Review Board's September 2000 decision which is now being challenged on appeal. The following summarizes the rulings issued during the course of this protracted review process.

*ALJ I:*  ALJ V.M. McElroy heard the case and issued a July 20, 1987 Decision and Order ("D&O") awarding benefits. The ALJ did not address whether Mr. Flynn had established a "material change in conditions" since the denial of his previous claim. He did, however, find Flynn totally disabled due to pneumoconiosis arising out of his fifty years of coal mine employment.

*BRB I:*  Grundy Mining appealed and, on January 31, 1989, the Board issued a D&O vacating the award and remanding the matter for further consideration. The Board found that ALJ McElroy had overlooked the "material change" issue, but nevertheless held that Flynn had established a material change as a matter of law under *Spese v. Peabody Coal Co.*, 11 BLR 1-174 (Ben. Rev. Bd. 1988). The Board remanded, however, for further consideration on the merits of benefits entitlement.

*ALJ II:* On remand, ALJ McElroy again awarded benefits, this time in a D&O dated April 29, 1991. However, the ALJ failed to address Grundy Mining's motion to dismiss and transfer liability to the Trust Fund.

*BRB II:* Grundy Mining again appealed. On October 4, 1993, before the Board could issue a decision, Mr. Flynn died, and his widow, Gussie Flynn, pursued the claim on his behalf. On April 4, 1994, the Board once again vacated the ALJ's findings on the merits of entitlement and remanded for further consideration. In so ruling, however, the Board re-affirmed its earlier holding of "material change," and also rejected Grundy Mining's transfer argument on the ground that only the 1984 claim — which did not qualify for transfer — remained open.

*ALJ III:* On January 30, 1995, ALJ Campbell issued a D&O on remand reinstating the award of benefits. First, the ALJ found that pneumoconiosis had been established on the basis of both the x-ray evidence and the medical opinions. Second, he found that Dr. Fritzhand's 1984 opinion (that Flynn could do no more than sedentary activity) established total disability since Flynn's last coal mine employment was incompatible with this sedentary restriction. The ALJ went on to explain that Dr. Fritzhand's 1984 opinion outweighed the non-qualifying pulmonary function and blood gas studies because such results "are not self explanatory, and no physician has used them to support a conclusion that Claimant is not disabled due to pneumoconiosis." (J.A. at 49.)

Finally, regarding disability causation, ALJ Campbell noted that Dr. Fritzhand had diagnosed both cardiac and pulmonary conditions in his 1984 report. However, the ALJ pointed out that, in this report, Dr. Fritzhand had explicitly stated that Flynn's limitation to sedentary activity was attributable to pulmonary disease. Consequently, ALJ Campbell reasoned that "the limitation due to pulmonary disease that Dr. Fritzhand listed must be related to pneumoconiosis because

pneumoconiosis is the only pulmonary disability that Dr. Fritzhand included in his 1984 medical report." (*Id.*)

*BRB III:* The Board affirmed the award of benefits in a D&O dated July 27, 1995. In so holding, the Board first addressed the proper standard for establishing a "material change in conditions." In its initial decision, the Board held that Flynn had established a "material change" pursuant to the then-prevailing *Spese* standard. In *Sharondale Corp. v. Ross*, 42 F.3d 993, 997 (6th Cir. 1994), however, this Circuit rejected the *Spese* standard. Consequently, the Board now held that a "material change" consistent with *Sharondale* would be established if it could affirm ALJ Campbell's finding that Dr. Fritzhand's 1984 opinion established total disability.

Next, in affirming this finding, the Board explained that the ALJ permissibly found the doctor's opinion sufficient to establish total disability, since this finding was based on a comparison of Dr. Fritzhand's 1984 assessment limiting Flynn to sedentary activity with the exertional requirements of Flynn's last coal mine employment. The Board further held that ALJ Campbell acted within his discretion in determining that Dr. Fritzhand's medical report outweighed the non-qualifying test results.

Proceeding to the issue of pneumoconiosis, the Board upheld the ALJ's determination that Dr. Fritzhand's 1984 opinion was documented and reasoned. Because there were no contrary medical opinions of record, the Board affirmed ALJ Campbell's finding of pneumoconiosis. Finally, while the Board recognized that Dr. Fritzhand had diagnosed heart disease as well as coal mine employment-related pneumoconiosis, it held that the ALJ had acted within his fact-finding discretion in determining that Flynn's total disability was due to pneumoconiosis.

*BRB IV:* In response to Grundy Mining's timely motion for reconsideration, the Board vacated the award and

remanded in a D&O on Reconsideration dated July 14, 1997. In so ruling, the Board construed the last portion of *Sharondale* as "requir[ing] that a miner show that there has been a worsening in his physical condition." (J.A. at 30.) The Board therefore instructed the ALJ to address on remand whether there was any qualitative difference between Dr. Fritzhand's two opinions:

> [T]he administrative law judge, on remand, must explain whether he merely disagreed with the previous characterization of Dr. Fritzhand's 1980 medical report [as not establishing disability] or whether claimant has shown, through the submission of Dr. Fritzhand's 1984 medical opinion, a material change in his condition since the earlier denial.

(J.A. at 32.) Thus, the sole purpose for remand was reconsideration of the "material change" issue under the Board's revised reading of *Sharondale*.

**ALJ IV:** On November 5, 1998, ALJ Campbell issued a D&O on Remand ("ALJ IV") awarding benefits. At the outset, the ALJ opined that this case was factually similar to *Lisa Lee Mines v. Director, OWCP*, 86 F.3d 1358 (4th Cir. 1996) (*en banc*), *cert. denied*, 519 U.S. 1090 (1997), in which the Fourth Circuit addressed the meaning of the "material change" standard. The ALJ accepted *Lisa Lee Mines* as persuasive authority, and described it as standing for the proposition that "an administrative law judge cannot base a finding of material change on his or her disagreement with the factual underpinnings of a prior denial." (J.A. at 23.) Rather, in a material change analysis, the ALJ must accept as correct both the prior denial and the facts necessary to sustain it. (*Id.*) Applying this standard, the ALJ reasoned that since Flynn's earlier claim was denied and Dr. Fritzhand's 1980 opinion was part of the record considered on that occasion, it followed that this opinion did not establish total disability. (*Id.* at 24.)

ALJ Campbell next turned to the inquiry that the Board had instructed him to perform on remand, and found that there were qualitative differences between Dr. Fritzhand's two reports. Specifically, the ALJ observed that in 1984, Dr. Fritzhand conducted new pulmonary function and blood gas studies which, though still not qualifying, reflected at least some declining values. Additionally, the ALJ noted that Dr. Fritzhand had conducted a new physical examination in 1984, resulting in a "sedentary" restriction that was more limiting than the "mild activity" finding in the doctor's 1980 report. Thus, ALJ Campbell concluded that Flynn established a "material change in conditions" consistent with the Board's directives.

**BRB V:** On September 27, 2000, the Board affirmed ALJ Campbell's finding of a "material change in conditions" and, therefore, affirmed the award of benefits. In the process, the Board declined to revisit the issue of whether Dr. Fritzhand's 1984 opinion was documented and reasoned based on the law-of-the-case doctrine. Instead, the Board endorsed the ALJ's reasoning vis-à-vis "material change" because Dr. Fritzhand had conducted a new physical examination and new objective tests in 1984, and had downgraded Flynn's physical capacity from "mild activity" in 1980 to "sedentary activity" in 1984. The Board did note Dr. Fritzhand's findings that Flynn could walk 200 feet in 1980 and 300 feet in 1984, but nonetheless held that substantial evidence supported the ALJ's findings, and that this minor incongruity would not have required the ALJ to discredit the 1984 report.

Grundy Mining timely sought reconsideration of the Board's latest ruling, but the Board summarily denied this request on December 20, 2000. This appeal followed.

### III. *ANALYSIS*

Grundy Mining advances three challenges to the administrative award of black lung benefits to Mr. Flynn. First, it contends that the ALJ erred in finding a "material

change in conditions" since the denial of Flynn's previous claim. Next, Grundy Mining argues that the record is insufficient to sustain the ALJ's determination on the merits that Flynn was disabled due to pneumoconiosis. Finally, in the event that the award of benefits is sustained, Grundy Mining argues that the liability for this claim should be borne by the Black Lung Disability Trust Fund. We consider each of these contentions in turn.

## A. The ALJ Properly Found a "Material Change in Conditions" as Required to Avoid the *Res Judicata* Effect of the Denial of Mr. Flynn's Previous Claim for Benefits.

### 1. Standard of Review

Whether the ALJ and the Board applied the appropriate "material change" standard is a purely legal question that we address *de novo. See Director, OWCP v. Consolidation Coal Co.*, 884 F.2d 926, 929 (6th Cir. 1989). To the extent, however, that the ALJ's determination of a "material change" rests upon factual findings, we must accept all such findings that are "supported by substantial evidence in the record considered as a whole." *Consolidation Coal*, 884 F.2d at 929; *see also Peabody Coal Co. v. Hill*, 123 F.3d 412, 415 (6th Cir. 1997). More generally, in the course of our review, we must "keep in mind that the Black Lung Benefits Act is remedial in nature and must be liberally construed to include the largest number of miners as benefit recipients." *Peabody Coal*,123 F.3d at 415 (internal quotations and citations omitted).

### 2. The ALJ's "Material Change" Inquiry Fully Comported with the Standard Announced in this Court's *Sharondale* Decision.

As starkly illustrated by our recitation of the lengthy procedural history of this case, the "material change" standard has engendered a great deal of debate during the course of the

administrative proceedings now under review. When Mr. Flynn filed his most recent claim for black lung benefits in 1984, more than a year after his earlier claim was denied in 1981, the pertinent regulations in effect at the time required that his subsequent claim be denied "on the grounds of the prior denial" unless "there has been a material change in conditions." 20 C.F.R. § 725.309(c) (1999).[3]

We addressed this regulation at length in *Sharondale Corp. v. Ross*, *supra*. Upon surveying three possible constructions of the "material change" requirement, including the meaning adopted by the Board in *Spese*, *supra*, and the standard articulated by the Seventh Circuit in *Sahara Coal Co. v. OWCP*, 946 F.2d 554 (7th Cir. 1991), we elected to defer to the position advocated by the Director. *See Sharondale*, 42 F.3d at 997-98. Specifically, we characterized the Director's "one-element" test as follows:

> [T]o assess whether a material change is established, the ALJ must consider all of the new evidence, favorable and unfavorable, and determine whether the miner has proven at least one of the elements of entitlement previously adjudicated against him. If the miner establishes the

---

[3]The Secretary of Labor revised this regulation, along with many others applicable to black lung claim adjudication, in final rules published on December 20, 2000. *See* 65 Fed. Reg. 79920-80107 (Dec. 20, 2000). Throughout this opinion, we cite to the 1999 edition of Title 20, Code of Federal Regulations in order to refer to the regulations in their earlier form. All other references will be to the current regulations.

Although the revised regulations generally apply to pending claims, § 725.309 is one of the stated exceptions to this rule. *See* 20 C.F.R. § 725.2(c); 65 Fed. Reg. at 80057. The present version of this regulation no longer includes the "material change" language, but instead requires that a claimant demonstrate a change in "one of the applicable conditions of entitlement." 20 C.F.R. § 725.309(d). Because the current regulation does not apply here, we need not determine the legal significance of this revision.

existence of that element, he has demonstrated, as a matter of law, a material change.

*Sharondale*, 42 F.3d at 997-98.

In holding that the Director's interpretation was entitled to deference, we found that it struck a reasonable balance between *res judicata* concerns and the remedial nature of the BLBA:

Here, the Director's interpretation is premised on the notion that miners disabled by pneumoconiosis arising out of coal mine employment are entitled to benefits under the Act. It affords a miner a second chance to show entitlement to benefits provided his condition has worsened. The interpretation implicitly recognizes that the doctrine of res judicata is not implicated by the claimant's physical condition or the extent of his disability at two different times. The entitlement is not without limits, however; a miner whose condition has worsened since the filing of an initial claim may be eligible for benefits, but after a year has passed since the denial of his claim, no min[e]r is entitled to benefits simply because his claim should have been granted. The Director's interpretation takes into account the statutory distinction between a request for modification of the Board's decision and a request for benefits based on a material change in conditions. Accordingly, we find the Director's interpretation to be reasonable in light of the purpose of the statute and the language included in § 725.309(d).

*Sharondale*, 42 F.3d at 998.[4]

---

[4] *Sharondale* addressed § 725.309(d) (1999), while this case concerns § 725.309(c) (1999). The operative language of these two subsections is identical, however.

Finally, we considered whether the administrative decision under review properly found a "material change in conditions" in accordance with the standard we had adopted:

Under the Director's interpretation, the ALJ did not properly analyze the facts. In assessing the second claim, the ALJ concluded that because he found the new x-ray evidence established the existence of pneumoconiosis, a material change in [claimant] Ross's condition had occurred. The record shows, however, that both positive and negative x-ray interpretations by both "B" readers and "non-B" readers accompanied [Ross's] 1979 claim as well as the 1985 claim. The ALJ never discusses how the later x-rays differ qualitatively from those submitted in 1985. Thus, we are unable to discern on the record before us whether the ALJ merely disagreed with the previous characterization of the strength of the evidence or whether Ross indeed had shown the existence of a material change in his condition since the earlier denial.

*Sharondale*, 42 F.3d at 999 (footnotes omitted).

This last portion of *Sharondale* gives rise to the parties' principal point of contention in this case. Arguably, under a strict reading of the "one-element" test endorsed by the Director, the ALJ's "material change" inquiry is limited solely to the new evidence of the claimant's condition since the denial of his prior claim, with the ALJ asking whether this evidence establishes at least one of the elements of benefit entitlement that previously were adjudicated against the claimant. There seemingly is no place in this inquiry for comparison between the new evidence and the evidence produced in connection with the prior claim. Yet, in applying the "one-element" standard to the facts in *Sharondale*, we faulted the ALJ for failing to determine whether the claimant's new x-ray evidence "differ[ed] qualitatively" from the facially similar x-ray evidence that accompanied the prior claim. *Sharondale*, 42 F.3d at 999. On remand, we directed the ALJ to determine whether there was such a qualitative

difference, or whether the ALJ "merely disagreed" with the decision to deny the prior claim under a qualitatively similar evidentiary record. 42 F.3d at 999.

In the present case, Grundy Mining reads *Sharondale* as augmenting the basic "one-element" test in one important respect. Upon finding a change in at least one of the elements of benefit entitlement — the pure "one-element" inquiry — the ALJ then must compare the evidence accompanying the miner's two claims, in order to determine whether a qualitative difference in the record supports the change in outcome as to this element. The Director, on the other hand, argues that this reading of the last paragraph of *Sharondale* is irreconcilable with the immediately preceding portion of that decision, in which the panel held that the Director's "one-element" standard was entitled to deference as a reasonable exercise of agency policy-making authority. It is quite unlikely, in the Director's view, that the *Sharondale* Court would critique the competing "material change" standards, accurately summarize the Director's proposed "one-element" test and its rationale, announce its adoption of the Director's interpretation, and then, in the very next paragraph, disregard the strict "one-element" standard and order the ALJ to examine the evidence underlying the denial of the original claim as a prerequisite to finding a "material change."[5]

---

[5]The Director also suggests, and Judge Moore likewise maintains in her concurrence, that this interpretative dilemma can be avoided by construing the last paragraph of *Sharondale* as not actually mandating a comparison of the evidence accompanying a miner's first and subsequent claims. This argument rests largely on *Sharondale*'s reference to "later x-rays," in contrast to "those submitted in 1985." 42 F.3d at 999. In the Director's view, as further explicated in the concurrence, the *Sharondale* panel meant only to fault the ALJ in that case for failing to properly address **all** of the x-rays submitted with the miner's **duplicate 1985 claim**. The ALJ erred, in other words, by favoring the "later x-rays" submitted in support of the duplicate claim over those x-rays "submitted in 1985."

This proposed reading of *Sharondale* is demonstrably incorrect, however, as shown by the very record the Director cites in support of it.

We are not free to pick and choose the portions of a prior published decision that we will follow and those that we will disregard. Nor do we enjoy greater latitude in situations where our precedents purportedly are tainted by analytical flaws, as the Director contends is the case with *Sharondale*. Rather, we are bound by the published opinions of previous panels, and this rule encompasses all parts of a prior ruling that are properly construed as holdings rather than dicta. *See Johnson v. City of Cincinnati*, 310 F.3d 484, 493 (6th Cir. 2002), *cert. denied*, 123 S. Ct. 2276 (2003). It can hardly be contended that the final paragraph of *Sharondale* is dicta, as this is the portion of the opinion in which the panel applied the "material change" standard to the facts of the case before it. Specifically, although the miner in that case had met the strict terms of the "one-element" test — his initial claim was denied for failure to establish the presence of

---

Simply stated, there **were** no such distinct "1985" and "later" subsets of x-ray evidence accompanying the miner's duplicate claim in that case. With the benefit of the underlying administrative decision, as placed into the record by the Director, we learn that the x-rays accompanying the miner's duplicate claim in *Sharondale* were taken in April and May of **1986** and July, November and December of **1989**. *See Ross v. Sharondale Corp.*, Case No. 86-BLA-4985, slip op. at 7 (July 25, 1990) (unpublished). Thus, **no x-rays were taken in 1985,** and it follows that none could have been submitted that year versus "later." Moreover, it is not even true that the ALJ in *Sharondale* uniformly favored the "later" over the earlier x-rays accompanying the miner's duplicate claim. Rather, the ALJ considered all of the 1989 and one of the 1986 x-rays, with the remaining 1986 x-ray given little weight because it was classified by two B-readers as unreadable. Nothing in *Sharondale* suggests that the panel meant to fault the ALJ for this analysis.

In light of this record, it seems evident that *Sharondale*'s reference to "1985" x-rays is a typographical error. If we assume that the panel meant to refer to x-rays "submitted in 1979," the year of the miner's initial claim, the last paragraph of *Sharondale* makes coherent sense, with one sentence flowing logically into the next. In any event, as discussed below, it is not necessary for us to venture a definitive pronouncement about the meaning of *Sharondale*, because an intervening panel has already done so, and we are bound to follow this subsequent ruling.

pneumoconiosis, while the ALJ found that this condition was established through the evidence accompanying his subsequent claim — the panel directed the ALJ to conduct a further inquiry whether this change in outcome was attributable to qualitatively different evidence, as opposed to the ALJ's different assessment of an essentially unchanged evidentiary record. The import of *Sharondale* is clear, then — miners whose claims are governed by this Circuit's precedents must do more than satisfy the strict terms of the one-element test, but must also demonstrate that this change rests upon a qualitatively different evidentiary record.[6]

Indeed, any lingering uncertainty about the proper reading of *Sharondale* surely has been dispelled in this Court's subsequent decision in *Tennessee Consolidated Coal Co. v. Kirk*, 264 F.3d 602, 608-10 (6th Cir. 2001). There, as here, the employer contended that *Sharondale* mandates an inquiry beyond the one-element standard, under which "the new medical evidence must be compared with the preexisting medical evidence on the same issue" to determine if a different outcome is warranted. *Kirk*, 264 F.3d at 608. We agreed:

> As the employer correctly points out, if the ALJ need only assess whether the new medical evidence proved an element previously held to have been missing, it would allow the relitigation of cases in which the new and old

medical evidence were essentially the same, but in which there had been a legal error in the previous adjudication. In *Sharondale,* we held that such situations were correctable within the one-year time period after a denial, but that after this point, a claimant is not "entitled to benefits simply because his claim should have been granted." 42 F.3d at 998. In order to maintain this limitation in favor of finality, and in order to measure a "*change* in conditions" the ALJ must compare the sum of the new evidence with the sum of the earlier evidence on which the denial of the claim had been premised. A "material change" exists only if the new evidence both establishes the element *and* is substantially more supportive of claimant.

*Kirk*, 264 F.3d at 609 (footnote omitted).[7]

*Kirk* further explains that the "change" referred to under the "material change" standard "is the actual difference between the bodies of evidence presented at different times," while "the 'materiality' of the change is marked by the fact that this difference has the capability of converting an issue determined against the claimant into one determined in his favor." 264 F.3d at 609 n.6. Applying this standard to the facts before it, the panel found that "[t]he ALJ in this case made a legal error similar to that of the judge in *Sharondale*

---

[6] As the Director and the concurrence observe, two of our sister circuits have declined to endorse the final paragraph of *Sharondale*, on the ground that it apparently "require[s] consideration of the evidence behind the earlier denial to determine whether it 'differ[s] qualitatively' from the new evidence." *Lisa Lee Mines*, *supra*, 86 F.3d at 1363 n.11; *see also Lovilia Coal Co. v. Harvey*, 109 F.3d 445, 454 n.7 (8th Cir. 1997). Yet, we fail to see how this supports the Director's position here. To the contrary, these Fourth and Eighth Circuit decisions seemingly share our own view as to the proper reading of *Sharondale* and the inquiry called for under that ruling. These other circuits, of course, are free to disagree with *Sharondale* and adopt a different rule, but we enjoy no such latitude here.

[7] In light of this plain language, which is accurately recounted in the concurrence, we fail to discern the basis for Judge Moore's disagreement with our reading of *Kirk*. The concurrence recognizes **both** that the Director's strict one-element test does **not** call for a comparison of the evidence accompanying a miner's prior and current claims, (*see* Concurring Op. at 31), **and** that *Kirk* **does** require such a comparison, to ensure that the miner's current claim is not accompanied by evidence which is "identical" or "substantially similar" to that which accompanied the prior claim, (*see id.* at 36). Any such "substantially similar" inquiry plainly entails **some** comparison of the new and old evidence, as Judge Moore concedes in her concurrence. This being so, we rely on the language of *Sharondale* and *Kirk* to determine the precise nature and extent of this comparison.

by failing to show that, on the element selected to show a material change, there was in fact a worsening of claimant's condition." 264 F.3d at 609. *Kirk* also cautions that the ALJ must accurately identify the elements of entitlement adjudicated against the miner in the earlier claim denial, because these elements are the proper focus of a subsequent "material change" inquiry.

In sum, our precedents have defined the relevant inquiry with sufficient clarity. In order to grant a subsequent claim for black lung benefits more than a year after an earlier claim has been denied, the ALJ must (i) determine, based upon all of the evidence accompanying the subsequent claim, that the miner has proven at least one of the elements of benefit entitlement previously adjudicated against him; (ii) find, based upon a comparison of the sum of the new evidence with the sum of the evidence considered in connection with the earlier claim denial, that the new evidence is sufficiently more supportive to warrant a change in outcome; and, finally (iii) determine on the merits, based upon the entirety of the record, that the miner is entitled to benefits. Significantly, despite the Director's protests against the second step of this inquiry, the Board in this case correctly perceived the need for this evidentiary comparison under this Circuit's precedents, and remanded the matter to the ALJ for a third and final time expressly for this purpose. Consequently, we discern no legal error in the Board's interpretation of the "material change" standard, and Grundy Mining does not contend otherwise.

It remains only to ask, therefore, whether the ALJ's finding of a "qualitative difference" in the records accompanying Mr. Flynn's initial and subsequent claims is supported by substantial evidence. As explained in *Kirk*, any such difference must be sufficient to account for the change in one or more of the elements of entitlement that were found lacking in the adjudication of Mr. Flynn's initial claim. The specific element of entitlement at issue here is total disability — the record indicates that the evidence submitted in connection with Mr. Flynn's initial claim was deemed

sufficient to establish the existence of pneumoconiosis, but that this claim was denied for failure to establish that this condition was totally disabling. (*See* J.A. at 96, 103.) Accordingly, to satisfy the "material change" standard, there must be a qualitative difference in the evidence as it bears upon this element of total disability.

In comparing the two bodies of evidence accompanying Mr. Flynn's initial and subsequent claims, the ALJ focused almost exclusively on differences between the 1980 and 1984 reports of Dr. Martin Fritzhand, who examined Flynn on behalf of the DOL. In particular, Dr. Fritzhand opined in his 1980 report that Flynn could do "mild activity at best," (J.A. at 133), but his 1984 report stated that Flynn was limited to "no more than sedentary activity," (J.A. at 167.) The ALJ found that Dr. Fritzhand's downgraded assessment of Flynn's condition was properly supported by a change in the objective medical data, where separate physical examinations, pulmonary function studies, and arterial blood gas studies had been conducted in the course of Flynn's 1980 and 1984 visits with this physician.

We find no basis to disturb the ALJ's determination that qualitative differences exist between Dr. Fritzhand's 1980 and 1984 reports, and that these differences support a changed outcome on the issue of total disability. There is no question that Dr. Fritzhand's two reports, on their face, reflect a degree of worsening in Mr. Flynn's condition between 1980 and 1984. Specifically, as observed by both the ALJ and the Board, Dr. Fritzhand found that Flynn was capable of mild activity in 1980, but only sedentary activity in 1984. In an earlier round of the administrative proceedings, the ALJ found that "Claimant's coal mine employment, although light-duty work, required more than sedentary activities," so that "Dr. Fritzhand's conclusion [in 1984] that Claimant is limited to sedentary activities establishes that Claimant was totally disabled from his coal-mine employment." (J.A. at 49.) Grundy Mining does not challenge this reasoning on appeal, but apparently concedes that a limitation to sedentary

activity, if supported by the evidence, would render Flynn incapable of engaging in his usual coal mine work or comparable employment. Likewise, Grundy Mining does not dispute that the sedentary limitation reported by Dr. Fritzhand, if credited and properly supported, bears directly on the "total disability" element that was adjudicated against Flynn in the denial of his earlier claim.[8]

Nonetheless, Grundy Mining contends that Dr. Fritzhand's cursory statements regarding "mild" versus "sedentary" activity cannot alone establish a qualitative difference between the physician's 1980 and 1984 reports, absent underlying medical evidence that would support Dr. Fritzhand's downgraded assessment. The medical record, in Grundy Mining's view, is virtually unchanged from 1980 to 1984. On both occasions, for example, Dr. Fritzhand reported non-qualifying pulmonary function and blood gas studies, and his two physical examinations both revealed that Flynn's "breath sounds [were] clear without rales, rhonchi, or wheezes." (J.A. at 135, 169.) Indeed, Grundy Mining notes that Dr. Fritzhand's reports reflect improvement in one respect — the 1980 report states that Flynn could "ambulate on level terrain no more than 200 feet without associated shortness of breath," (J.A. at 135), while this distance increased to 300 feet in the 1984 report, (J.A. at 169).

The material change standard, however, does not demand that a claimant's new evidence point uniformly and unmistakably toward a more favorable outcome. Such a

---

[8]It follows from these concessions that Flynn has satisfied the strict "one-element" standard advocated by the Director, because the new evidence establishes an element that was adjudicated against Flynn in the denial of his earlier claim. Yet, as explained above, more is required under this Court's "material change" precedents. Unfortunately, the Director's brief on appeal is content to rest on the incorrect premise that *Sharondale* mandates only a "one-element" inquiry; the Director expresses no view as to whether the ALJ properly performed the additional comparison required under our *Sharondale* and *Kirk* decisions.

requirement would transcend the finality concerns behind the "material change" standard, and would effectively penalize miners whose initial claims were denied. This problem would be particularly acute in cases where the miner narrowly fails to prove the conditions of benefit entitlement; under such circumstances, it would be unreasonable to insist that the miner's new evidence accompanying a subsequent claim be significantly and uniformly more supportive of an award of benefits, when even a modest change in the overall record would suffice to establish all of the elements of entitlement. All that we require is that the evidence be sufficiently different to warrant a different outcome on one or more of these elements, so that we need not be concerned that two factfinders are making different assessments of essentially the same record. As stated in *Kirk*, the change must be "material," meaning that it "has the capability of converting an issue determined against the claimant into one determined in his favor." 264 F.3d at 609 n.6.

Upon comparing the sum of the new evidence accompanying Flynn's 1984 claim with the evidence submitted in connection with his prior claim, we find sufficient differences to meet this standard and, more specifically, to support Dr. Fritzhand's downgraded assessment from "mild" to "sedentary." As the ALJ observed, the studies performed in 1984, while still non-qualifying, revealed some declining results in individual values. Moreover, Dr. Fritzhand did conduct a second physical examination of Flynn in 1984. While a detailed explanation of the "sedentary" limitation might have been preferable, we decline Grundy Mining's invitation to assume that Dr. Fritzhand's choice of the words "mild" in 1980 and "sedentary" in 1984 lacks any significance or medical basis whatsoever, particularly where the employer has not produced any evidence or opinion that Flynn was capable of more than sedentary activity at the time of his second claim. Finally, as further evidence of Flynn's declining condition between 1980 and 1984, we note: (i) that he remained on the job when Dr. Fritzhand first examined him, but had ceased working at the

time of his 1984 physician visit;[9] (ii) that Dr. Fritzhand diagnosed pneumoconiosis following the second exam, in contrast to his 1980 diagnosis of chronic obstructive pulmonary disease; and (iii) that the record includes statements from Flynn and his co-workers that he required assistance in performing his duties during his last few years on the job, (*see* J.A. at 140, 142, 144).

We recognize that Mr. Flynn's new evidence accompanying his 1984 claim does not all point decisively toward a finding of benefit entitlement. Again, however, the bar is not so high for a miner to demonstrate a "material change in conditions" under the governing regulations. Accordingly, we affirm the decision of the Board that Mr. Flynn's 1984 claim satisfies this standard.

**B.    The ALJ's Decision to Award Benefits Is Supported by Substantial Evidence.**

Having determined that Mr. Flynn had satisfied the "material change" standard, the ALJ turned to the merits of Flynn's 1984 claim for black lung benefits, and found that the miner had established total disability due to pneumoconiosis. We must affirm this decision provided that it rests upon substantial evidence in the record. *See Consolidation Coal*, 884 F.2d at 929. In arguing that this decision should be set aside, Grundy Mining contends that the evidence is lacking as to a causal link between pneumoconiosis and total disability. We agree with the Board, however, that the ALJ's resolution of the causation issue reflects a proper exercise of his factfinding authority.

The claimant bears the burden of proving total disability due to pneumoconiosis and, as Grundy Mining correctly

---

[9] Notably, the fact that Flynn was still working counted against him in the adjudication of his initial claim, because it rebutted a presumption of total disability due to pneumoconiosis. (*See* J.A. at 98, 103, 108.)

notes, this causal link must be more than *de minimis*. *Peabody Coal Co. v. Smith*, 127 F.3d 504, 507 (6th Cir. 1997). To satisfy the "due to" requirement of the BLBA and its implementing regulations, a claimant must demonstrate by a preponderance of the evidence that pneumoconiosis is "more than merely a speculative cause of his disability," but instead "is a contributing cause of some discernible consequence to his totally disabling respiratory impairment." *Smith*, 127 F.3d at 507. To the extent that the claimant relies on a physician's opinion to make this showing, such statements cannot be vague or conclusory, but instead must reflect reasoned medical judgment. *See Griffith v. Director, OWCP*, 49 F.3d 184, 186-87 (6th Cir. 1995).

The parties here agree that Mr. Flynn's showing of causation rests upon Dr. Fritzhand's 1984 report. Grundy Mining contends that careful examination of this report reveals no specific finding that pneumoconiosis contributed in any way to Flynn's disability. In support of this argument, the employer notes that Dr. Fritzhand diagnosed heart disease as well as pneumoconiosis, and that the detailed findings set forth in his typewritten report provide no basis to discern which of these conditions was the cause of Flynn's disability. Moreover, at least some of these findings seemingly suggest that Flynn's pulmonary condition might not be the cause of his disability — Dr. Fritzhand reported, for example, that Flynn's chest expansion was "normal," that he did not "use accessory muscles of respiration," and that his "breath sounds [were] clear without rales, rhonchi, or wheezes." (J.A. at 169.)

These points, while certainly relevant to the causation inquiry, do not compel us to reject the ALJ's findings on this factual issue. The ALJ expressly recognized that Dr. Fritzhand's 1984 opinion diagnosed heart disease as well as pneumoconiosis. Nonetheless, in determining that the latter was at least a contributing cause of Flynn's disability, the ALJ observed that Dr. Fritzhand reported his "sedentary" finding in a section of the DOL medical history and

examination form in which the physician is asked to describe the limitations "due to pulmonary disease." (J.A. at 167.) Accordingly, the ALJ reasoned that "the limitations due to pulmonary disease that Dr. Fritzhand listed must be related to pneumoconiosis because pneumoconiosis is the only pulmonary disability that Dr. Fritzhand included in his 1984 medical report." (J.A. at 49.) The Board determined, and we agree, that the ALJ drew a reasonable inference that lies within his "broad discretion in evaluating the medical evidence." (J.A. at 39.) "[A] reviewing court may not set aside an inference because it finds another more reasonable." *Moseley v. Peabody Coal Co.*, 769 F.2d 357, 360 (6th Cir. 1985).

Nor can we accept Grundy Mining's assertion that any causal connection identified by Dr. Fritzhand lacks support in the underlying medical evidence. As noted, pneumoconiosis need not be the sole cause of a miner's disability, but only a contributing factor. Dr. Fritzhand's 1980 and 1984 reports alike state that Mr. Flynn had a long history of shortness of breath, that he could ambulate only a few hundred feet without associated shortness of breath, that this symptom increased upon climbing stairs or walking up grades, that he could not mow a lawn without associated dyspnea, that he frequently awoke during the night with shortness of breath, and that he had long suffered from a chronic cough. All of this provides support for a link between pulmonary disease and disability. In addition, the ALJ noted the absence of any medical opinion contradicting Dr. Fritzhand's report or otherwise suggesting that Flynn's limitations might be due to a condition other than pneumoconiosis.

Under this record, the assessment of Dr. Fritzhand's report is "essentially a credibility matter" for the ALJ to resolve, and it would lie beyond "our limited scope of review" to assign a different weight or meaning to this medical opinion. *Peabody Coal Co. v. Groves*, 277 F.3d 829, 836 (6th Cir. 2002), *cert. denied*, 537 U.S. 1147 (2003). Consequently, we affirm the

Board's determination that Flynn is entitled to an award of black lung benefits.

## C. Grundy Mining Has Failed to Identify a Basis for Imposing Liability on the Trust Fund.

Finally, in an appeal to notions of equity, Grundy Mining argues that the Black Lung Disability Trust Fund should bear the liability for the award of benefits to Mr. Flynn. This is a purely legal issue that we address *de novo. See Consolidation Coal*, 884 F.2d at 929. This matter is readily resolved, as it is inextricably linked with our disposition of the "material change" issue.

Grundy Mining's argument on this point rests upon the premise that Dr. Fritzhand's 1980 and 1984 reports are "nearly identical," (Petitioner Br. at 20), so that they both must equally establish Mr. Flynn's entitlement to black lung benefits. It follows, in Grundy Mining's view, that Flynn must have been just as entitled to benefits under his initial claim as under his present one. Yet, if benefits had been awarded under the initial claim, the liability would have been borne by the Trust Fund under the transfer provisions of the BLBA. *See Quarto Mining, supra*, 901 F.2d at 535 (explaining the operation of this statutory scheme). From all this, Grundy Mining reasons that it should not be made to pay for the presumably mistaken decision to deny Flynn's initial claim; rather, equity dictates that the Trust Fund should assume any liability.

Liability properly transfers from the responsible operator to the Trust Fund on those claims which were finally denied before the effective date of the Black Lung Benefits Reform Act of 1977 (*i.e.,* March 1, 1978), but then reopened and approved under the 1977 Act. *See Caney Creek Coal Co. v. Satterfield*, 150 F.3d 568, 570-71 (6th Cir. 1998); *Quarto Mining*, 901 F.2d at 535. Mr. Flynn's initial claim was denied prior to, and then reopened under, the 1977 Act. As such, liability for this earlier claim would have been

transferred to the Trust Fund had benefits been awarded. This claim was denied, however, and this decision became final upon the expiration of the allotted period for appealing or seeking modification. Grundy Mining, therefore, must invoke notions of *equity* in order to transfer liability to the Trust Fund, because such a transfer obviously is not compelled as a matter of *law.* As the Board correctly held, Flynn's current claim, which was filed in 1984, does not meet the statutory criteria for transfer, as it was not (and, as a practical matter, could not have been) denied before the effective date of the 1977 Act.

Yet, Grundy Mining's equitable appeal quickly founders on a flawed logical premise. In rejecting Grundy Mining's challenge on the "material change" issue, we have already held that there was a qualitative difference in the bodies of evidence accompanying Mr. Flynn's initial and subsequent claims. Accordingly, there was nothing necessarily wrong, much less unfair, in the contrary results reached on Flynn's two claims. Indeed, principles of finality flatly preclude us from questioning the correctness of the initial claim denial, and these same principles would defeat Mr. Flynn's 1984 claim if, as Grundy Mining now contends, the evidence accompanying the two claims was essentially unchanged. By holding that Flynn's 1984 claim satisfied the "material change" standard, and that benefits were properly awarded under this claim, we have already rejected the necessary predicates to Grundy Mining's plea for equitable relief. Consequently, we affirm the Board's decision on this point.

## IV. *CONCLUSION*

For the reasons set forth above, we **AFFIRM** the decision and order of the Benefits Review Board awarding black lung benefits to claimant Douglas W. Flynn.

---

## CONCURRENCE

---

KAREN NELSON MOORE, Circuit Judge, concurring. I concur in the result in this case that the award of black lung benefits was proper. However, because I believe that the majority's interpretation of *Sharondale Corp. v. Ross* and *Tennessee Consolidated Coal Co. v. Kirk* is erroneous, I write separately.

In *Sharondale Corporation v. Ross*, 42 F.3d 993 (6th Cir. 1994), we spent considerable time assessing the three alternate interpretations of the "material change" requirement. These included the meaning adopted by the Benefits Review Board in *Spese v. Peabody Coal Co.*, 11 BLR 1-174 (1988) (that the "new evidence present a 'reasonable possibility' that it would change the prior administrative result"), the standard enunciated by the Seventh Circuit in *Sahara Coal Co. v. Director, OWCP*, 946 F.2d 554, 556 (7th Cir. 1991) ("[a] material change in condition means either that 'the miner did not have black lung disease at the time of the first application but has since contracted it and become totally disabled by it, or that his disease has progressed to the point of becoming totally disabling although it was not at the time of the first application'"), and the position posited by the Director.

Ultimately, we chose to defer to the Director's interpretation of "material change in conditions," thereby adopting what has come to be appropriately named the "one element" test. *Sharondale*, 42 F.3d at 997-98. The test holds that "to assess whether a material change is established, the ALJ must consider all of the new evidence, favorable and unfavorable, and determine whether the miner has proven at least one of the elements of entitlement previously adjudicated against him. If the miner establishes the existence of that element, he has demonstrated, as a matter of law, a material change. Then the ALJ must consider whether

all of the record evidence, including that submitted with the previous claims, supports a finding of entitlement to benefits." *Id.* In accepting this test, we stressed that we did not have unbridled discretion in "adopting one construction over another," and that we have "previously afforded due deference to the Director's position in cases raising similar questions of regulatory interpretation." *Id.* at 998 (quoting *Brown v. Rock Creek Mining Co.*, 996 F.2d 812, 816 (6th Cir. 1993)) (internal quotation omitted). We went on to note that because Congress failed to provide us with a definition of "material change" as it is used in the BLBA, "the Secretary of Labor's interpretation of the provisions of the Black Lung Act [wa]s entitled to deference," as long as it was reasonable. *Id.* After thorough discourse, we concluded that it was "reasonable in light of the purpose of the statute and the language included in § 725.309(d)."[1]  *Id.* at 998. Now, however, the majority wishes to depart from this view and restrict the test in a manner not at all endorsed by the Director.

The majority concedes that "under a strict reading of the 'one-element' test endorsed by the Director, the ALJ's 'material change' inquiry is limited *solely* to the *new evidence* of the claimant's condition since the denial of his prior claim, with the ALJ asking whether this evidence establishes at least one of the elements of benefit entitlement that previously was adjudicated against the claimant." Op. at 16 (emphasis added). The majority proceeds to state that "[t]here seemingly is no place in this inquiry for comparison between the new evidence and the evidence produced in connection with the prior claim." Op. at 16-17. However, it then endorses Grundy's reading of *Sharondale* as requiring the ALJ to engage in a qualitative analysis to determine if the new evidence accompanying the subsequent claim is different

---

[1] *Sharondale Corp. v. Ross*, 42 F.3d 993 (6th Cir. 1994), involved § 725.309(d), while the case at hand involves § 725.309(c). This is irrelevant, however, as the language of both sections in 1999 is identical.

from the old evidence that supported the earlier claim. The majority believes this to be the correct view based on the last paragraph of *Sharondale*, in which it claims that "we faulted the ALJ for failing to determine whether the claimant's new x-ray evidence 'differ[ed] qualitatively' from the facially similar x-ray evidence that accompanied the prior claim." Op. at 16. Therefore, the majority chooses to interpret this last paragraph of *Sharondale* as adding an additional requirement to the "one element" test. However, this is not the correct interpretation of *Sharondale*.

First of all, the language of *Sharondale* does not support the broad interpretation the majority wishes to assign to it. The case stands for the simple premise that after passage of one year from the denial of a claim, claimants can no longer argue they are entitled to benefits solely on the ground that their prior claims "should have been granted." *Sharondale*, 42 F.3d at 998. Instead, they must demonstrate a material change and provide new evidence establishing such change. *Id.* at 997-98. In embracing the Director's interpretation of "material change," we emphasized that "[t]he Director's interpretation takes into account the statutory distinction between a request for modification of the Board's decision and a request for benefits based on a material change in condition." *Id.* at 998. Outside of this, *Sharondale* does not speak to the manner in which a subsequent claim should be assessed. As a result, in no way can *Sharondale* be construed as adding any further requirements to the "one element" test.

Grundy argues, and the majority accepts as true, that the last paragraph of *Sharondale* supports the interpretation of the additional qualitative analysis requirement. The last paragraph of *Sharondale* stems from the *Sharondale* court's expression in the previous paragraph of concern with regard to claimants who file subsequent claims supplemented by the exact same evidence that supported a prior claim. It is readily apparent that because of this concern, we spoke to the manner in which ALJs might ferret out claims seeking purely a modification of a decision on a prior claim, and not based on

any material change, as is required by the statute. In so doing, we never stated that this method should also become a part of the Director's "one element" test.

Furthermore, the meaning the majority wishes to give to this discussion fails to take note of an important textual difficulty which totally undermines such an interpretation. By pointing out that "[t]he ALJ never discusses how the later x-rays differ qualitatively from those submitted in 1985," the *Sharondale* court was simply admonishing the ALJ for its failure to address and weigh all of the x-rays submitted with the claim filed in *1985*.[2] *Sharondale*, 42 F.3d at 999. The majority asserts that because the underlying 1990 ALJ decision speaks only of x-rays taken in 1986 and 1989, there were no x-rays submitted in 1985 when the claim was filed, and hence the Sixth Circuit's reference to 1985 was a "typographical error." Op. at 18 n.5. However, the ALJ's 1990 opinion fails to identify what medical evidence accompanied the second claim at the time it was filed in 1985. *See Ross v. Sharondale Corp.*, Case No. 86-BLA-4985, slip op. at 6-8 (July 25, 1990) (unpublished). The majority cannot simply conclude that because of this, there were no x-rays taken in 1985, as nothing exists in the record available to us to indicate one way or the other. In addition, to dismiss summarily the 1985 reference as a "typographical error" seems implausible, as it is a rather significant error for the entire Sixth Circuit panel to have overlooked.

Moreover, grammatically speaking, that the *Sharondale* court was criticizing the ALJ for its failure to address and weigh all of the x-rays submitted with the subsequent 1985 claim is the only legitimate conclusion. As used in this context, "later" means "subsequent." *See* Merriam Webster Online Dictionary, http://www.merriam-webster.com (Oct.

---

[2]The miner's previous claim was filed in 1979 and was finally denied in 1981. Subsequently, the miner filed a claim for benefits in 1985. *Sharondale*, 42 F.3d at 995.

22, 2003). Hence, the reference to the "later" x-rays can only mean those ones developed subsequent to 1985. In addition, the *Sharondale* court's act of faulting the ALJ for failing to look at *all* of the x-rays produced to support the 1985 claim was appropriate in light of our decision in *Woodward v. Director, OWCP*, 991 F.2d 314, 320-21 (6th Cir. 1993). In that case, we discussed the decision of the ALJ to limit consideration of x-ray evidence solely to the last five x-rays taken. *Id.* at 319. Specifically, we "recognized the need for *qualitative* evaluation of the x-ray evidence, as well" as a quantitative analysis. *Id.* at 321 (emphasis added). The ALJ in *Sharondale* appears to have relied on the later x-ray interpretations that were submitted to support the second claim, and excluded the earlier x-ray interpretations also submitted with the same claim. *See Sharondale*, Case No. 86-BLA-4985, slip op. at 6-8. As a result, our opinion in *Sharondale* should not be interpreted to require the ALJ to compare the evidence from the second claim with that from the earlier denied claim. In order for that to be the case, the sentence would have to have said "differ qualitatively from those submitted in *1979*," and not *1985*. Hence, the majority's conclusion that *Sharondale* holds that miners "must do more than satisfy the strict terms of the one-element test" by "demonstrat[ing] that this change rests upon a qualitatively different evidentiary record," Op. at 19, is not supported by the language of *Sharondale*.

Concededly, it cannot be denied that the phrase "the earlier denial" in the last sentence of the last paragraph of *Sharondale* does in fact refer to the 1979 claim. The Director views this sentence as merely serving "to point out that the ALJ's failure to consider all of the x-ray readings submitted with the duplicate claim raised the possibility that the preponderance of that evidence might weigh against the presence of pneumoconiosis, and a material change, just as the conflicting x-ray evidence submitted with the 1979 claim weighed against the existence of the disease." Appellee's Br. at 23-24. Alternatively, this last sentence might also be read as instructing the ALJ to compare the evidence submitted

with the second claim with that submitted with the previously denied claim. Indeed, as the Director appropriately points out, these "textual difficulties" in the last paragraph of *Sharondale* may have been the reason why both the Fourth and Eighth Circuits, uncertain as to its meaning, were unwilling to adopt this part of the opinion, as they stated that the paragraph "*seems* to have required consideration of the evidence behind the earlier denial to determine whether it 'differ[s] qualitatively' from the new evidence." *Lisa Lee Mines v. Director, OWCP*, 86 F.3d 1358, 1363 n.11 (4th Cir. 1996) (emphasis added); *Lovilia Coal Co. v. Harvey*, 109 F.3d 445, 454 n.7 (8th Cir. 1997) (emphasis added) (quoting *Lisa Lee Mines*, 86 F.3d at 1363 n.11).

In addition to these "textual difficulties" created by Grundy's interpretation, even more arduous to overcome is its insistent focus on the paragraph in isolation. As the Director notes, "[t]he paragraph must, of course, be read in the context of the entire decision that precedes it." Appellee's Br. at 24. Immediately preceding the paragraph at issue, the *Sharondale* court, after engaging in a thorough analysis of the differing "material change" standards, concluded that the Director's "one element" test should be accorded deference because it was a reasonable construction of the regulation at issue. *Sharondale*, 42 F.3d at 998. The Director never spoke of a qualitative analysis as part of a "material change" determination. Indeed, the "one element" test espoused by the Director flatly bars review of evidence from previous claims unless and until a "material change" has been proven. *Id.* at 997-98. As the Director states, the "[c]ourt implicitly acknowledged the irrelevance of evidence regarding the miner's condition at the time of the first claim — prior to the establishment of a material change — in disregarding the standard articulated by the Board in its *Spese* decision." Appellee's Br. at 25.

Furthermore, the majority's reliance on *Tennessee Consolidated Coal Co. v. Kirk*, 264 F.3d 602 (6th Cir. 2001), as further support for the qualitative analysis requirement is

misplaced. In that case, we stated that, when the new and old medical evidence was substantially similar, we had held in *Sharondale* that "such situations were correctable within the one-year time period after a denial, but that after this point, a claimant is not 'entitled to benefits simply because his claim should have been granted.'" *Id.* at 609 (quoting *Sharondale*, 42 F.3d at 998). Hence, *Kirk* holds that "in order to measure a '*change* in conditions' the ALJ must compare the sum of the new evidence with the sum of the earlier evidence on which the denial of the claim had been premised." *Id.* "A 'material change' exists only if the new evidence both establishes the element *and* is substantially more supportive of claimant." *Id.*

Through its analysis, the *Kirk* court did not add a new requirement to the "one element" "material change" standard. Rather, *Kirk* reasserts approvingly the Director's "one element" test immediately before discussing the need for comparison of the new and old evidence so as to rule out claims based on the same evidence. *Id.* More importantly, however, the opinion reiterates the important difference between "claim modification" and "material change" analysis. In discussing the method to be employed in examining whether evidence submitted on a subsequent claim is identical to that submitted on a prior claim, this court stated that the "ALJ must compare the *sum* of the new evidence with the *sum* of the earlier evidence on which the denial of the claim had been premised." *Id.* (emphasis added). The *Kirk* court was simply making the ALJ aware of situations in which a claimant attempts to circumvent the statutory requirements after a year has passed, by submitting the exact same evidence in the hope that it will be treated by the court as demonstrating a material change. As a result, the *Kirk* court is saying that "[i]n order to maintain this limitation in favor of finality," it would be prudent for ALJs to engage in an overview comparison of the sum of the evidence to rule out duplicate claims. *Id.* Nowhere in the *Kirk* opinion is there a call for ALJs to engage in a thorough evidentiary qualitative

analysis between the evidence in the old and new claims in assessing a "material change in conditions."

Moreover, acceptance of the Director's interpretation of the *Sharondale* "material change" standard is consistent with the other circuits that have dealt with this issue. In particular, both the Fourth and Eighth Circuits have accepted the Director's interpretation of the "material change" standard. *See Lisa Lee Mines*, 86 F.3d at 1363; *Lovilia*, 109 F.3d at 454. In so doing, both courts refused to endorse the final paragraph of *Sharondale*, which "seems to have required consideration of the evidence behind the earlier denial to determine whether it 'differ[s] qualitatively' from the new evidence." *Lisa Lee Mines*, 86 F.3d at 1363 n.11; *see also Lovilia*, 109 F.3d at 454 n.7. Furthermore, the *Lovilia* court, in deciding to accept the Director's approach, noted that pursuant to established Supreme Court precedent, "[w]hen, like in this case, the issue is whether the agency has erred in interpreting its own regulations, the Supreme Court has stated that: provided the agency's interpretation 'does not violate the Constitution or a federal statute, it must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Lovilia*, 109 F.3d at 451-52 (quoting *Shalala v. St. Paul-Ramsey Med. Ctr.*, 50 F.3d 522, 527-28 (8th Cir. 1995) (quoting *Stinson v. U.S.*, 508 U.S. 36, 45 (1993)). This demonstrates that we are violating established principles when in one instance, we accord due deference to the Director's interpretation in deciding to accept it, but then in the next instance, infuse it with a meaning not a part of the Director's interpretation. This clearly provided the impetus for both *Lisa Lee Mines* and *Lovinia* to reject the interpretation of *Sharondale*'s final paragraph that the majority now suggests.

Finally, misconstruing the Director's "one element" test by adding a qualitative analysis completely undermines the very reason we felt compelled initially to accept the "one element" test. In assessing the reasonableness of the Director's interpretation, we noted that his view was "premised on the

notion that miners disabled by pneumoconiosis arising out of coal mine employment are entitled to benefits under the Act. It affords a miner a second chance to show entitlement to benefits provided his condition has worsened." *Sharondale*, 42 F.3d at 998. We concluded that it was important to accept the Director's interpretation because it was "reasonable in light of the purpose of the statute and the language included in § 725.309(d)." *Id.*

It strikes me as rather schizophrenic of us in *Sharondale* to painstakingly analyze and weigh the competing "material change" interpretations, choose the Director's test, and then immediately afterwards, depart from the test that we have chosen to adopt. Because of this, I believe that the interpretation of *Sharondale* that the majority endorses is wrong. Furthermore, despite the fact that the ambiguous language of *Sharondale* leaves the meaning of the last paragraph open to multiple interpretations, the rest of the decision *does* acknowledge the principle that it is inappropriate to compare the evidence in a new claim with the evidence submitted in connection with a previously denied claim in assessing whether a "material change" has been established. To retreat from the "one element" test that we endorsed not only violates the deference due the Director as noted above, but also proves utterly contradictory of our own *Sharondale* opinion. For these reasons, I concur only in the result.